## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| HOWARD CASPER | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | No. 00-CV-3465 (JEI) |
| v. | : | |
| | : | |
| SMG, formerly known as | : | |
| SPECTATOR MANAGEMENT | : | |
| GROUP, | : | |
| and | : | |
| ROBERT McCLINTOCK, | : | |
| and | : | |
| SOUTH JERSEY REGIONAL | : | |
| COUNCIL OF CARPENTERS, | : | |
| LOCAL 623, | : | |
| | : | |
| Defendants. | : | |

---

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
### TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

GARY GREEN
CASEY GREEN
Attorneys for Plaintiff
**SIDKOFF, PINCUS & GREEN, P.C.**
2700 Aramark Tower
1101 Market Street
Philadelphia, PA 19107
(215)574-0600

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................................ iv

I.    Background   ............................................................................................................... 1

II.   Counter-Statement of Genuinely Disputed Facts ..................................................... 2

      A.    Overview ......................................................................................................... 2

      B.    Description of the Markets and Economic Relationships ................................ 4

            1.    The Markets and Products ...................................................................... 4

            2.    Regional/National Decorators vs. Local Decorators ............................ 6

      C.    The Facts Establishing the Illegal Combination and Agreement
            and Its Consequences and Results ................................................................... 8

            1.    SMG's Plan and Its Implementation With the Carpenter Union .......... 8

            2.    SMG Gave the Carpenter Union Unchecked Power to Restrain
                  Trade and Exclude, at Its Whim, Any Show Contractor That
                  Does Not Please It .............................................................................. 13

      D.    The 1983 Collective Bargaining Agreement With the
            Carpenter Union Did Not Conform to Modern Trade Show
            Standards, and Was Replaced After 1992 With a Series of
            Unwritten, Vague, Informal and *Ad Hoc* Truces, As Well As
            Several, Formal Written Agreements ............................................................. 15

            1.    Summary of This Section .................................................................... 15

            2.    SMG's Changes in the Lease Agreement Between the
                  "Building" and Its Show Producers Tenants Are a Nail in the
                  Coffin of the 1983 Carpenter Union CBA ........................................... 16

            3.    The 1983 Collective Bargaining Agreement Was Unworkable
                  and Onerous in the Modern Trade Show Setting and It Was
                  Abandoned by the Parties .................................................................... 18

4.    The 1983 Carpenter Union CBA Was <u>Not</u> Renewed in Accordance With Its Terms, and It Was Abandoned by the Parties Which Operated Under *Ad Hoc*, Informal, Temporary Arrangements .................................................................19

5.    The 1983 Carpenter Union CBA Was Replaced by the Written "Chairman Francis" Agreements That Superseded and Contradicted It ................................................................20

6.    The 1983 Carpenter Union CBA Was Superseded By the Written Project Only Agreement ("POA") Which Contradicted the 1983 CBA ........................................................................21

7.    The April 15th Agreement Did Not Resurrect the 1983 Carpenter Union CBA, and There Was No Basis to Apply It to AES ...............................................................................23

E.    SMG Planned and Used Its Monopoly Power in Combination With the Carpenter Union to Implement a Scheme That Resulted in the Carpenter Union's 7 County Lock-up That Restrained the Business and Trade of the Atlantic City Based Local Show Contractors ........................................25

1.    SMG Wanted to Terminate Its Role As the Employer of the Carpenters and to do That Without Facing Labor Unrest at the Atlantic City Convention Center, It Used Its Market Power to Sacrifice the Show Contractors to Appease the Carpenter Union .................................................25

2.    SMG Accomplished Its Purpose of Leveling Its *Carpenters-Burdened* Playing Field for Common Shows, and Thus Increased the Number of Smaller Shows It Booked Following the 7 County Agreement's Requirement That Show Contractors had to use the Carpenters for trade shows held in the Atlantic City Casino Hotels ................................................27

F.    Plaintiff's Antitrust Contentions ..................................................29

1.    Illegal Tying Arrangement – General Discussion ................................29

2.    Description of Market For Tying Product ...........................................31

3.    Injury to Competition Caused by the Tying Arrangement ...................33

4.   There Is No Requirement in a Tying Case That the Defendants
Participate In the Markets For Both the Tying and The Tied
Product.................................................................................................35

5.   Concerted Refusal to Deal .................................................................37

6.   Defendants' Acts Caused  Injury to Competition..................................40

III.   Conclusion   .................................................................................................46

## TABLE OF AUTHORITIES

### CASES

*Action Ambulance Service, Inc. v. Atlanticare Health Services, Inc.*
  15 F. Supp. 33 (D. Mass 1993)................................................................. 30,35,36,37

*Anderson Foreign Motors, Inc. v. New England Toyota Distrib., Inc.*
  475 F. Supp. 973 (D. Mass. 1979)............................................................. 29

*Fisher v. City of Berkeley*
  475 U.S. 260 (1986) ................................................................................ 41

*Fishman v. Wirtz*
  807 F.2d 520 (7th Cir. 1986)................................................................... 38

*Jefferson Parish Hospital Dist. No. 2 v. Hyde*
  466 U.S. 2 (1984) ................................................................................... 29,30,33,36,37

*Larry v. Muko, Inc.v. Southwestern Pennsylvania Building And
  Construction Trades Council*
    609 F.2d 1368 (3rd Cir. 1979)............................................................... 42

*Northern Pac. and Times-Picayune Pub. Co. v. United States*
  345 U.S. 594 (1953) ............................................................................... 29,33

*Northern Pac. Ry. v. United States*
  356 U.S. 1 (1958) ................................................................................... 29,30,33

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*
  72 U.S. 284 (1985) ................................................................................. 39,40

*Spectacor Management Group  v. National Labor Relations Board*
  20 F.3d 38 (3rd Cir. 2002) .................................................................... 1,2

*United States v. E. I. du Pont de Nemours & Co.*
  51 U.S. 377 (1956) ................................................................................. 33

*Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*
  50 F.2d 803 (1st Cir.), cert. denied, 488 U.S. 955 (1988)...................... 30

### STATUTES

15 U.S.C. § 1 ........................................................................................... 4

## I.    Background

Plaintiff stands in the shoes of his former company ("AES"), which since the early

1990's, has been based in the vicinity of Atlantic City, and operates a business that provides

decorating services for trade shows and other public gatherings ("trade shows") consisting of the

set-up and take-down of exhibits, as well as providing planning and furnishings.[1]  The customers

of AES were the owners and producers of trade shows ("Show Producers") as well as exhibitors

who rented space from the Show Producers.

This is an antitrust case seeking damages under the Sherman Act, §1, from SMG, a

private corporation that operates and manages public assembly facilities on behalf of

municipalities that own the facilities,[2] Robert McClintock,[3] and the South Jersey Regional

Council Of Carpenters,  Local 623, ("Carpenters' Union").  SMG was hired by a New Jersey

agency to manage and operate the Atlantic City Convention Center.[4]

The period in which defendants antitrust violations occurred ("Liability Period") is

**October 1, 1998** (when SMG required AES to use the Carpenter Union labor for a trade show in

the Atlantic City Convention Center), through **February 13, 2003** (when the Third Circuit, in the

---

[1]      Entities that perform this type of services shall be known as "Show Contractors"

[2]      *See*, JA153. An earlier iteration of this dispute was decided in *Spectacor Management Group v. National Labor Relations Board* 320 F.3d 385 (3rd Cir. 2002) ("NLRB Appeal"), and the five volume Joint Appendix submitted by the parties in  the NLRB Appeal has been copied here, and appears in Plaintiff's Appendices "I" through "M". Documents, testimony and rulings referenced in this brief that came from the NLRB Appeal's Joint Appendix retain their original page numbers from the Joint Appendix. They are cited here with the prefix "JA___".

[3]      From July of 1995 until October of 2003, Robert McClintock ("McClintock") was employed by SMG as the General Manager of the Atlantic City Convention Center.  (JA 153, 154; Appendix "E", n.t. McClintock, at pp. 6-7).

[4]      The original Atlantic City Convention Center located on the Boardwalk  ("Boardwalk Hall") was owned by the New Jersey Sports and Exposition Authority ("NJSEA") which operated the facility through the Atlantic City Convention Center Authority ("ACCCA"). Both were New Jersey State level agencies. Appendix "E", n.t. McClintock, at pp. 40-41.  NJSEA hired SMG to manage the Boardwalk Hall as well as a new facility (the Atlantic City Convention Center"), about four blocks away, while the Atlantic City Convention Center was still under construction. (JA 154) The new Atlantic City Convention Center opened for business in May of 1997. (Appendix "E", n.t. McClintock, at p.8; JA 160). SMG reported to both the NJSEA and the ACCCA (renamed the "Atlantic City Convention and Visitors Authority") (Appendix "E", n.t. McClintock, at p. 40)  One important fact is that SMG and McClintock each were compensated with an **incentive bonus** based on their financial performance in managing the Atlantic City Convention Center. (Appendix "E", n.t. McClintock, at p. 360)

NLRB Appeal, affirmed the NLRB finding that SMG's requirement violated §8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e);  and in compliance with that ruling, SMG allowed AES to use a labor source of its choice).

## II.    Counter-Statement of Genuinely Disputed Facts

### A.    Overview

In this section, we will provide an annotated narrative that will tell the highlights of Plaintiff's side of the story, and will fill in the enormous gaps left by defendants' very truncated and somewhat self-serving version of what happened.  Later in the brief, we will single out specific issues for a more intense analysis.[5]

Plaintiff agrees with the majority of the facts found by Judge Schlesinger at the end of the NLRB hearing, and in the light of the page limitation allowed by this Court, Plaintiff adopts Judge Schlesinger's findings, and incorporates them by reference here, with the exception a few points with which we disagree.  In those few instances, we will reference convincing evidence we found in discovery that did not make it to the NLRB hearing, and this evidence will speak for itself in explaining why we disagree.  In addition, again, because of space limitations in this document, we incorporate by reference the complete Affidavit and Report of Patrick Perrino.[6] Plaintiff likewise adopts and incorporates by reference the expert report of Professor Philip L. Harvey.

The skeleton facts giving rise to this case were recited by the Third Circuit in the NLRB Appeal at *Spectacor Management Group v. National Labor Relations Board* 320 F.3d 38, 388-

---

[5]       In writing this brief, we kept in mind that in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986),  the Supreme Court did not create a special burden on plaintiffs responding to summary judgment challenges in antitrust cases, but requires only that the non-moving party's inferences be reasonable and not "economically senseless." *Eastman Kodak Company v Image Technical Services, Inc.*, 504 U.S. 451, 468 (1992)

[6]       Appendix "O", Affidavit and Report of Patrick Perrino

389, (3rd Cir. 2002) where the Third Circuit summarized what was proven at the NLRB hearing. In its Opinion, the Third Circuit highlighted that SMG had been the employer of Carpenters doing show work at the Atlantic City Convention Center, but that that in 1996, SMG sought to "remove itself as the middleman between show exhibitors and laborers, leaving the direct employment of labor to subcontractors or tenants." (*Id.*) The court further recounted how SMG and the Carpenter Union entered into a letter agreement dated April 15, 1996 ("April 15th Agreement") that addressed what would happen in the event that SMG subcontracted out show work.[7] Then the Court said, "AES, unlike many, if not all, of the other subcontractors at the Convention Center, did not sign an agreement with the Union but chose to use its own employees, members of the Painters Union. In 1998, as an AES employee was installing a tradeshow exhibit at the Center, he was ordered to stop working by a Union foreman. Thereafter, the SMG General Manager demanded that AES either use Union laborers or leave the Convention Center altogether. This current litigation ensued." (*Id.*)

The Third Circuit's Opinion accurately focused on the April 15th Agreement because it was important in the NLRB case to show the unfair labor practice, and it is important here to show the unlawful conspiracy and agreement to restrain trade. As we demonstrate from the evidence, the April 15th Agreement gave rise to, and was defendant's purported justification for

---

[7]       At the time of the April 15th Agreement, SMG was still acting as the employer of the Carpenters at the Atlantic City Convention Center. The text of the April 15th Agreement, which is reproduced at JA386 states:

> Trade employees who work on a part-time basis or who
> perform contracted work for SMG (e.g. "show" labor) will
> work under a Separate Agreement which will be negotiated as
> soon as is practicable. It is understood and agreed that the
> Separate Agreement will contain a provision stipulating that in
> the event SMG subcontracts the covered work, the covered
> work will be subcontracted to a firm which will . . . negotiate
> an agreement with the (Trade) Local having jurisdiction over
> that work with SMG. The said sub-contractor will be free to
> negotiate the terms and conditions of the said agreement and
> will not be bound by SMG's agreement(s) with the applicable
> local union.

the coercion directed at AES as defendants attempted to force AES to agree to the Carpenter Union's collective bargaining agreement which would have obliged AES to use Carpenters in every venue where it did business in Southern New Jersey ("Carpenter Union's 7 County Lock-up").

## B.    Description of the Markets and Economic Relationships

### 1.    The Markets and Products

Plaintiff brings this case because the Atlantic City Convention Center is the only venue in the entire South Jersey shore area ("Atlantic City Geographic Market") where trade shows that required more than 10,000 square feet could be held ("Convention Center Only Shows").[8] This case involves violations of § 1 of the Sherman Act[9] through a tying arrangement and a concerted refusal to deal in connection with the sale of trade show labor for Convention Center Only Shows in the Atlantic City Geographic Market.  Trade show labor can be sold to Show Producers and their exhibitors either: directly by a union (or individuals in the case where the Show Producers use non-union employees); or through a middleman hired by the Show Producers to coordinate the installation, dismantling and layout of the trade show floor ("Show Contractor").[10]

---

[8]    Appendix "E", n.t. McClintock, at pp.221-222.  It cannot be contested that the Atlantic City Convention Center has no competition in the Atlantic City and surrounding Southern New Jersey area for large trade shows. The Atlantic City Convention Center has 487,000 square feet available for shows, and in size, it is one of the 30 largest sites for conventions. (Appendix "E", n.t. McClintock, at p.153) *See*, also, discussion, *infra*.

[9]    15 U.S.C.A. § 1

[10]    The lease (or license) the Show Producer enters into with the manager of the Atlantic City Convention Center drives the legal relationships between all of the participants in a trade show transaction. As we shall establish, before SMG took over the management of the Atlantic City Convention Center, it was managed by a State agency that had a collective bargaining agreement with the Carpenter Union. In that situation, the lease stated that the show labor would be provided by the Convention Center to the Show Producers, which be billed for that labor as part of its rent. Under the lease, the Show Producers had no say or responsibility in what labor was used. After SMG took over, it stopped providing any show labor, and accordingly, it re-wrote the lease as a license in which it was the responsibility of the Show Producers to procure their show labor. Nothing in the SMG license prevented the Show Producers from using their own employees or from making a deal with a union to provide this labor.

AES was a Show Contractor that had a collective bargaining agreement with the Painter's Union under which AES essentially bought labor from the Painter's Union, and resold it with a mark-up to its Show Producer and exhibitor customers.[11]  During the period relevant to this case, it was common for a Show Producer to first select the Atlantic City Convention Center as the site for its trade show, and after it signed SMG's License agreement to rent space, the Show Producer would seek to hire a Show Contractor (although nothing in the SMG License stopped a Show Producers from using its own employees or making a direct deal with another source of labor).[12]  In selecting a Show Contractor, a Show Producer typically would look for a firm that had experience with trade shows in Atlantic City; and in the case of a trade show that met the size criteria for a Convention Center Only Show; it would seek a Show Contractor with experience at the Atlantic City Convention Center.

This case deals with Show Contractors seeking to buy labor at the wholesale level with the intention of reselling it along with other services to those Show Producers (and their exhibitors) who already had committed to do a show at the Atlantic City Convention Center.[13]  Schematically, the relevant customers at the "wholesale level" were the Show Contractors who sought to buy trade show labor in Atlantic City.  The customers at the retail level were Show

---

[11]      (JA84-85) The collective bargaining agreement with the Painter's Union covered the entire State of New Jersey. (JA356). The Painter's Union members performed the identical services at the Atlantic City Convention Center as the Carpenter Union. To obtain the labor, AES would contact the Painter's Union, and it would send workers who were paid according to the collective bargaining agreement AES had with the Painter's Union. Customers of AES were charged based in part, on the labor that was used.

[12]      The Montana Group Inc, is a Show Producer who was approved by the Carpenter Union to sign the Carpenter Union's 7 County Lock-up and was allowed to hire Carpenters to work on its own show at the Atlantic City Convention Center. (Appendix "H", n.t. Tarby, at pp. 122-123) Therefore, the group of "customers" for labor services at the Atlantic City Convention Center includes Show Producers as well as Show Contractors.

[13]      While there was no legal requirement that a Show Producer use a union shop, the practicalities of doing business in Atlantic City demonstrated that all of the Show Contractors working in the Atlantic City Convention Center market proposed to obtain their labor from either the Carpenter Union, the Painter's Union or the Stage Hands Union.

Producers with existing contracts to hold trade shows at the Atlantic City Convention Center, and the exhibiters at their shows.[14]

### 2.   Regional/National Decorators vs. Local Decorators

There is a difference in the markets served by Regional and National Decorator[15] ("Regional/National Contractors") and those served by small, local Decorator Show Contractors. The Regional/National Contractors" serve large, national accounts that produce traveling and other types of major shows that are held in the highest traffic venues (known hereinafter as "premier venues") such as Las Vegas, Chicago and Florida.[16] Moreover, the market for the Regional/National Decorator Show Contractors is spread out across the entire United States, and they compete against each other for the major national and traveling shows.[17] The Regional /National Firms have their own local offices in every one of the premier venues, as well as in certain other cities that have significant trade show and convention business.[18] Typically, branch

---

[14]   Typically, the Show Producers do not select a Show Contractor until after they have sealed their deal with the facility housing their show. Therefore, this case deals with the Show Contractors' efforts to buy labor and resell it to customers who already committed to have their show in the Atlantic City Convention Center. This is the same market dynamic that existed during the pre-SMG period, when the State agency managed the facility and employed the Carpenters directly. A Show Producer and its exhibitors would not order Carpenter labor in advance of the show. Rather, they would purchase the Carpenter labor at a marked up ("retail") price from the manager of the Atlantic City Convention Center  on an as-needed basis when the show moved into the building.(Appendix "E", n.t. McClintock, at p. 257)

[15]   Because this section relies heavily on Perrino's Affidavit. We have used his term, "Decorator" instead of "Show Contractor".

[16]   One national company identified by Perrino (Appendix "G" Perrino Expert Report and Affidavit, p.) was GES Exposition Services ("GES"), which according to its web site, has 1,400 employees, serves more than 3,000 exhibitions and events annually in the premier venues throughout the United States and Canada for domestic and international clients. *See*, http://www.ges.com/about/our_history.asp. (Appendix "G" Perrino Expert Report and Affidavit, p.2-3)

[17]   (Appendix "G" Perrino Expert Report and Affidavit, p.3)

[18]   Another national decorating company identified by Perrino was Freemen Decorating, which has  3,600 employee who work out of Freeman's offices all over the United States including branches located in Las Vegas, Orlando, Chicago, Dallas, Denver, Atlanta, New Orleans, San Francisco, New York, Washington, D.C., San Antonio, Anaheim, Philadelphia, Nashville, St Paul, Pittsburgh, Detroit, Austin, Seattle, Braintree, Houston and San Diego. *See*, http://www.freemanco.com/freemanportal/freeman/. (Perrino Expert Report and Affidavit, p.2-3)

offices of the national firms have a warehouse full of equipment, and they are staffed by managers and marketers who live in the communities where their branches are located.[19]

The Regional/National Contractors prefer to seek business in markets where they have their own operations in place because of economics. When they are hired to service shows in venues such as Philadelphia, Dallas and Atlantic City that have smaller attendee and exhibitor participation ("minor venues"), if they do not have branch offices, they are forced to subcontract with a local Decorator Show Contractor, rent equipment from a local firm or transport in their own equipment and managerial staff.[20]  Because the Atlantic City Convention Center is not a premier venue[21] it is not surprising that two relatively small,  Atlantic City  based, local Decorator Show Contractors, AES and Vista, consistently accounted for almost two thirds of all shows at the Atlantic City Convention Center, and that the remaining third was split between other small local Decorator Show Contractors, with the Regional/National Contractors, Freeman and GES working a combined total of 53 shows out of a total of 303 during the more than five years and nine months in the period January 1, 1996 through September 30, 2001.[22]  In contrast to the Regional/National Decorator Show Contractors, a "local" Decorator Show Contractor performs decorating services primarily for shows that visit the minor venues where the local Decorators are situated. The local Decorators store their equipment for shows in their local facilities, and concentrate on mastering the elements of the local trade show market they serve. Typically, the local Decorators make use of labor in their own city, and use the same pool of employees for their shows, and these employees are familiar with the venues and the requirements of the shows that are performed in the local venues.

---

[19]     Appendix "G" Perrino Expert Report and Affidavit, p.2-3
[20]     Appendix "G" Perrino Expert Report and Affidavit, p.3
[21]     Appendix "G" Perrino Expert Report and Affidavit, p.3
[22]     Appendix "O", Table 1 to SMG's Expert Report; Appendix "O" n.t. Crawford,  p. 236

The local Decorators cannot, and do not compete with the Regional/National Decorators for the premier shows and those that travel because they do not have the capital assets (e.g., equipment and managers in several local venues), and because they are not established in the premier venues.

The local Decorators attempt to develop relationships with show managers and to be invited to perform decorating services for shows that passed through their local venue and travel to other locations, but the opportunities and instances of a local Decorator traveling with a particular show to a venue outside the local venue is the exception to the rule.

Local Decorators may also set up operations in other venues, but when they do, they still are local Decorators, albeit operating out of more than one venue because despite having more than one place of operations, they still cannot compete for the National shows, or to obtain significant business in the premier venues.

### C.    The Facts Establishing the Illegal Combination and Agreement and Its Consequences and Results

#### 1.    SMG's plan and its implementation with the Carpenter Union

As mentioned, when SMG took over the management of the Atlantic City Convention Center, it terminated the prior practice of hiring Carpenters and re-selling their services at a mark-up to the Show Producers and exhibitors. Instead, SMG severed its relationship with the Carpenter Union as an employer of its members for shows, and contractually (through the License) put the burden on the Show Producers to obtain their own show labor. However, instead of allowing the free market forces to determine who the Show Producer's Show Contractor could hire to perform show labor, SMG insisted that it would deal only with a firm that used Carpenters show labor under the Carpenter Union's 7 County Lock-up. The Carpenter Union's 7 County Lock-up resulted from a combination and agreement between SMG and the

Carpenter Union, but during the planning stages, the Carpenter Union did not insist that only Carpenters be allowed to perform work at the Atlantic City Convention Center. Instead, the Carpenter Union requested merely that the Show Contractors agree to pay wages and benefits equal to the Carpenter's rates to the show labor they hired.[23] However, SMG rejected the Carpenter Union's position, and instead required that the use of Carpenters be a condition of having their show at the Atlantic City Convention Center if the work was "subcontracted" by SMG.[24] Since SMG took itself out of the business of hiring show labor and re-selling it to its customers, the use of the concept of "subcontracting" as the trigger for when a Show Contractor would have to use Carpenters meant that it would be rare.

As early as 1995, SMG had a plan concerning what the Carpenter Union's work rules and conditions would be if they were to continue to work at the Atlantic City Convention Center. Under SMG's long range plan, the Carpenter Union would have to sacrifice things like double time for Saturday work, having non-working foremen and stewards be paid, minimum payments

---

[23]     On April 4, 1996 Robert Boyce, the Business Manager for the Carpenter Union (Appendix N, SMG 1528) wrote to McClintock' and proposed the following:

> "Trade employees who work on a part-time basis or who perform contracted work for SMG ([sic.] eg, "show labor") will work under a Separate Agreement which will be negotiated as soon as practicable. It is understood and agreed that the Separate Agreement will contain a provision stipulating that the Employer expressly reserves the right to have such work performed in such manner and by such employees, as may be furnished by a subcontractor **who will be required to pay the carpenters Building Contractors Association of New Jersey construction contract wages and hourly benefit contribution rate** equivalent for subcontractor employees engaged in all work customarily within the jurisdiction of the Carpenter Union"

(Appendix N, SMG 1528-1529) (Emphasis added)

As the record discloses, SMG made its announcement to the Carpenter Union that it was not going to be the employer of the show labor on or before March 7, 1996 because SMG 1528-1529 begins with the words, "Please allow this letter to memorialize the agreements we reached during our discussions on March 7, 1996 with regard to employees currently employed by SMG…" Boyce testified that he assumed the letter was based on notes he made at the meeting. (Appendix B)

[24]     When McClintock received his copy of Boyce's letter (Appendix N, SMG 1528-1529), it was already signed by Boyce, thus demonstrating that Boyce actually did believe his letter reflected the deal; and McClintock could not recall if he ever signed the Boyce letter-which demonstrates that the Boyce letter may indeed have been the agreement, and that forcing AES to operate under the 1983 Carpenter Union CBA was a naked and fraudulent restraint. (Appendix "E", n.t. McClintock, at pp. 140-141)

for hours that were not worked, and several other practices that were either mentioned in the 1983 Carpenter Union CBA, or were simply made part of how the Carpenter Union and the Atlantic City Convention Center operated. These work rules and conditions were bad for SMG because they were hated by the Show Producers, and exhibitors, and hurt the competitive position of the Atlantic City Convention Center when SMG tried to attract new shows. SMG also did not want to be the employer of the Carpenters at shows.

SMG got its way with the Carpenter Union because in the Carpenter Union's 7 County Lock-up, the Carpenter Union gave in to all of SMG's demands. However, the trade-off was that SMG insured that the Carpenter Union would begin to get show work at the casino hotels in Atlantic City. SMG did this by requiring every Show Contractor who wanted to work in the Atlantic City Convention Center to agree to use the Carpenter Union in the casino hotels as well as throughout the seven counties of Southern New Jersey contiguous with Atlantic City. Up to that time, when Show Contractors had a choice, they rarely or ever selected Carpenters to do show work at the casino hotels (or other venues in Southern New Jersey). In fact, before the SMG used the clout of the Atlantic City Convention Center to force the majority of local and regional Show Contractors to agree to the Carpenter Union's 7 County Lock-up, **the Carpenter Union never had a collective bargaining agreement with any Show Contractor for show work in Atlantic City.**[25]

Moreover, as we show in this brief, the Carpenter Union's 7 County Lock-up obtained for SMG and McClintock an additional benefit. Each was paid a bonus based on their financial performance in running the Atlantic City Convention Center, and because the Atlantic City Convention Center was committed to use the higher priced (and lower producing) Carpenters, the Atlantic City Convention Center had not been able to compete as well against the casino

---

[25]      Appendix "H", n.t. Tarby, at p 7

hotels for those smaller shows that could have been hosted at the Atlantic City Convention
Center or the casino hotels ("Common Shows"). However, as a result of the Carpenter Union's 7
County Lock-up, SMG was able to increase the number of COMMON shows at the Atlantic City
Convention Center by 37% in the first year of the Carpenter Union's 7 County Lock-up, and by
47% in the second year, even though the number of Convention Center Only Shows remained
relatively constant.

The Carpenter Union's 7 County Lock-up was a terrific arrangement for SMG. It ended
SMG's role as employer of the Carpenters for trade shows, it increased dramatically the number
of Common Shows at the Atlantic City Convention Center, and at the same time, it rid the
Atlantic City Convention Center of all of the Carpenter Union work rules that had hindered
SMG's efforts to market the Atlantic City Convention Center.

SMG was able to accomplish all of this because it had a monopoly in the market for
Convention Center Only Shows in Atlantic City Geographic Market; and it used its monopoly to
grant the Carpenter Union its own monopoly in selling show labor for Convention Center Only
Shows in the Atlantic City Geographic Market. Defendant McClintock was the orchestra leader
who put the whole thing together, and who used thug like tactics to enforce the implementation
of SMG's master plan. This is seen in the treatment AES received when it balked at signing the
Carpenter Union's 7 County Lock-up agreement. After SMG announced that it was no longer
employing Carpenters, AES began to use workers from the Painter's Union to service its
customers at the Atlantic City Convention Center. However, when the Carpenter Union
complained to McClintock, he ordered AES off the show floor while AES was in the midst of
setting up a trade show for one of its customers. McClintock demanded that AES either sign the
Carpenter Union's 7 County Lock-up, or SMG would bar AES permanently from doing work at

the Atlantic City Convention Center. When AES challenged McClintock, he said that SMG had a

an agreement with the Carpenter Union that all "subcontractors" had to use Carpenters. But,

since SMG was no longer an employer of show labor, and since AES had no agreement with

SMG, but instead was working for a Show Producer that had a License that said it was

responsible for obtaining its own labor, there was no basis for McClintock's claim; and no legal

right for SMG to bar AES from fulfilling its contract with its customer, and AES' obligations

under its collective bargaining agreement with the Painter's Union. Ultimately, SMG offered

another option: AES could perform services for its Show Producer customer, but SMG would go

back into the hiring hall business, and apply to AES the oppressive work rules under the

abandoned 1983 Carpenter Union CBA. Thus the deal that appeared to be on the table for AES

gave it three options: (1) agree to the Carpenter Union's 7 County Lock-up; (2) use Carpenters

through SMG under the 1983 Carpenter Union CBA; or (3) stay away from the Atlantic City

Convention Center. What SMG did not inform AES is that if it selected option number 3,

defendants would harass AES and continue to cause it trouble and extra expense until it finally

buckled and selected option number one.[26]

AES was unable to provide the high level of service to its customers due to the actions of

the defendant and the extra cost it was being charged. Furthermore, for new shows that had not

---

[26]     After AES had selected option number two, and paid SMG for Carpenters under the rates and work rules of
the 1983 Carpenter Union CBA, the Carpenter Union raised numerous jurisdictional disputes between the carpenters
and the painters that had no merit. SMG, did not discuss the grievances with AES, nor did it investigate any of
them. Instead, SMG billed AES the full sum to settle each of them, which greatly added to AES' cost. (Appendix
"C", n.t. Casper, at pp. 124-126) McClintock spoke to customers of AES (Jay Silberman and Lori Lowe), and
threatened, either directly or by inference, that they may experience labor problems if they used AES at the AC
International Power Boat show. In addition, SMG caused problems for AES' customers and potential customers by
warning them not to business with it due to problems the customer would have. (Appendix "C", n.t. Casper, at pp.
139-140; 127) AES was told by show managers that they were advised against using AES by the local carpenters'
union. (Appendix "C", n t. Casper, at pp. 138-1397) SMG would charge AES for damage to the building based on
uninvestigated and false reports filed by the Carpenter Union. (Appendix "C", n.t. Casper, at pp. 138) AES had
been hired directly by the Miss America Organization but paid by SMG, and had done the Miss America Pageant
for many years. However, in 2000, AES was even given a chance to do the pageant. The Miss America
Organization said that SMG didn't want to use AES and the Organization complied. (Appendix "C", n.t. Casper, at
pp.141-142)

been a customer of any of the Show Contractors previously, it would have been hard and risky for AES to attempt to under bid a Show Contractor who was a signatory to the trade show agreement and still make money.[27]

### 2. SMG gave the Carpenter Union Unchecked Power to Restrain Trade and Exclude, at its Whim, any Show Contractor that Does not Please It

The Carpenter Union's 7 County Lock-up and SMG's use of the April 15th Agreement as a pseudo excuse for forcing Show Contractor's to agree to the relinquish their bargaining and selection freedom in selecting the most efficient and low cost source of show labor is by itself, a mighty restraint on competition that ill serves the customers of show labor, and drives up the costs to the "retail customers at the Show Producer and exhibitor level of the market. However, it gets worse. SMG made obtaining an agreement from the Carpenter Union the condition precedent to being able to work for Show Producer at the Atlantic City Convention Center on reasonable terms. (The 1983 Carpenter Union CBA is not reasonable, as SMG itself proved when it ditched it.) By arming the Carpenter Union with this power of a labor source monopoly, SMG created an economic Frankenstein.

In recognition of its strong position viz SMG's grant of the monopoly to it, the Carpenter Union has adopted a policy under which it would not allow any Show Contractor to sign up with the Carpenter Union for just doing work at the Atlantic City Convention Center.[28] This rule of not negotiating a building contract with Show Contractors is a hard and fixed rule that doesn't bend.[29] The rule also is that the Carpenter Union will not negotiate with a Show Contractor to allow that contractor to use carpenters in a geographic area than is smaller than the its union

---

27  Appendix "C", n.t. Casper, at pp. 102
28  Appendix "H", n.t. Tarby, at pp. 43-44
29  Appendix "H", n.t. Tarby, at pp. 45

represents.[30] These rules might have been inferred from the way that AES was treated. But the power the Carpenter Union exercises is even greater.

Not every Show Contractor is allowed to sign the Carpenter Union's 7 County Lock-up agreement. Rather, the Carpenter Union, sends out agreements without a signature from the Carpenter Union and when the Show Contractor returns a signed contract, the Carpenter Union will then review it to determine if the Carpenter Union wants to allow that Show Contractor to do work in the Atlantic City Convention Center.[31] The Carpenter Union's criteria for allowing a Show Contractor to sign an agreement is arbitrary, and ad hoc. It was described by a union official as including: whether the Show Contractor is primarily in the trade show business; whether the Show Contractor has plans for its work; whether the Show Contractor can prove a history of having bona fide customers; whether the Show Contractor has a track record mainly to show their financial means; and what kind of experience and history did the Show Contractor have with organized labor.[32] If the Carpenter Union in its sole discretion does not think the Show Contractor passes its standard, it will not sign the agreement, and it will bar the Show Contractor from being able to perform services for a Show Producer at the Atlantic City Convention Center. In actuality, the standard the Carpenter Union uses is not written down, and is totally capricious; it is ultimately up to the union officials "common sense." or whatever the union official in charge wants to do.[33] An example of how this unfettered power blocked a Show Contractor from being able to work at the Atlantic City Convention Center because the Carpenter Union refused to sign his contract involves a signed version of the Carpenter Union's 7 County Lock-up that a company sent back to the Carpenter Union. However, the Carpenter Union

---

[30]   Appendix "H", n.t. Tarby, at pp. 46
[31]   Appendix "H", n.t. Tarby, at pp. 106-108
[32]   Appendix "H", n.t. Tarby, at pp. 108-114
[33]   Appendix "H", n.t. Tarby, at pp. 119

refused to countersign the contract. When asked why, the union official stated first that the

Carpenter Union will only sign with a company in the trade show business.[34]  The Carpenter

Union also has a policy of not signing a contract with any company it does not believe has a

history of being in the trade show business, so that means start-ups need not apply.[35]

     As if matters could get worse, the Carpenter Union has a side agreement with the Show

Contractors who signed the Carpenter Union's 7 County Lock-up that it will not approve any

potential company that wants to do service work who is not already in the trade show business.[36]

### D.   The 1983 Collective Bargaining Agreement with the Carpenter Union did not Conform to Modern Trade Show Standards, and was Replaced After 1992 with a Series of Unwritten, Vague, Informal and *Ad Hoc* Truces, as well as Several, Formal Written Agreements

#### 1.   Summary of This section

     In defendants' Motion, they depend heavily on the Court accepting as an undisputed fact

that that the collective bargaining agreement the ACCC had with the Carpenter Union in 1983

("1983 Carpenter Union CBA") was extended by oral agreement up to the present time.  This is

critical to defendants' case because the evidence establishes that SMG, using its power as the

only big game in town, threatened to, and then did revert to the 1983 Carpenter Union CBA as an

illegal, punitive measure designed to force AES to sign the collective bargaining agreement with

the Carpenter Union that SMG and the Carpenter Union were promoting.

     This section of our brief discusses one of several discrete reasons why the 1983 Carpenter

Union CBA expired by its own terms, and was abandoned as dead as of 1992; we demonstrate

from the evidence that each subsequent labor practice that resembled what was written in the

1983 Carpenter Union CBA was actually not the product of the parties following the 1983

---

[34]     Appendix "H", n.t. Tarby, at pp. 102-103.
[35]     Appendix "H", n.t. Tarby, at pp. 111,113
[36]     Appendix "H", n.t. Tarby, at pp. 114-115

Carpenter Union CBA, but rather, an *ad hoc,* unwritten, informal, accommodation that had been applied on a temporary basis. We will show also that none of these ad hoc practices made SMG bound to the 1983 Carpenter Union CBA. As we report the facts defendants shoved under the rug in their Motion, it will become clear that by the time the Atlantic City Convention Center opened, the 1983 Carpenter Union CBA had been replaced by several written agreements that contradicted many of its critical provisions, and further, neither the Carpenter Union nor SMG had made any reference to the dead 1983 Carpenter Union CBA after 1992 when both parties stopped the previous practice of signing a one year extension of the collective bargaining agreement.

Defendants' Motion, with blithe indifference to the facts in the record, summarily announces that the 1983 Carpenter Union CBA was still in effect during the Liability Period (and indeed, under defendants' logic, would continue to be legally in force today).

### 2.    SMG's Changes in the Lease Agreement Between the "Building" and Its Show Producers Tenants are a Nail in the Coffin of the 1983 Carpenter Union CBA

Under the 1983 Carpenter Union CBA,[37] the ACCCA was the <u>direct employer</u> of the Carpenter Union workers who set up and took down exhibits at trade shows. The ACCCA re-sold Carpenter Union services to Show Producers as part of the rent paid under leases the Show Producers signed. Thus the form "Lease" the ACCCA offered to Show Producers[38] stated at §§2 and 19:

> 2. *Rent.* All personnel or services requested or required will be at the prevailing rate at the time of the Convention or Event.
>
> 19. *Collective Bargaining Agreements.* In accordance with Lessor's collective bargaining agreements with various labor organizations, **Lessor's employees shall perform all work** on the

---

[37]    The terms of the 1983 Carpenter Union CBA are reproduced at JA388.
[38]    The form leases used by the ACCCA when the 1983 Carpenter Union CBA was in effect are reproduced in Appendix A at, p.1-1

Premises or in the Convention Center or adjoining property which is covered by those agreements. Accordingly, Lessee, any exhibitors to whom it rents exhibit space, and their contractors, subcontractors and other agents (collectively "employers") shall request or requisition the services of Lessor's employees from Lessor's service desk for all work covered by such agreements, and shall utilize only the services of such employees to perform such work." (Emphasis added) [39]

The provisions of the 1983 Carpenter Union CBA were deemed unfriendly to Show Producers and exhibitors, not in accord with trade show industry standards and uneconomical by Show Producers, exhibitors and Show Contractors.[40]

---

[39]    After the 1983 Carpenter Union CBA expired, with SMG controlling the management and operation of the Atlantic City Convention Center, it eliminated itself as the "employer" of the Carpenters, and accordingly, SMG changed its agreement with the Show Producers to reflect that "rent" paid by the Show Producers no longer included SMG providing Carpenters; and that SMG was neither the employer of the Carpenters, nor requiring the Show Producers to use members of the Carpenter Union. Thus the new "License" stated at §11 that SMG will not furnish to the Show Producers any Carpenters as part of the agreement.

> 11. Personnel. **Licensee agrees to employ** at its own expense all necessary personnel **not furnished by Licensor,** as part of this agreement. Such personnel, which Licensee agrees to employ, shall include but shall not be limited to public safety personnel, box office, ticket takers, ushers, EMT, stagehands, audio/visual technicians, electricians, **carpenters,** or other labor not expressly included in this Agreement... (Emphasis added) (JA480)

[40]    Appendix "E", n.t. McClintock, at pp. 32-33 [The Carpenter Union work rules under the 1983 Carpenter Union CBA increased costs to exhibitors, which deterred business from coming to the facility. The work rules decreased the likelihood that an exhibitor would want to participate in a show, thus making Atlantic City less attractive to Show Producers]; 13; 180-186; (See, also, JA680; Appendix "E", n.t. McClintock, at p.173, 174-180); Appendix "C", n.t. Casper, at pp.68-69 [Under the 1983 Carpenter Union CBA show producers and exhibitors found excessively high rates for overtime, poor productivity, requirement to pay hours for non-working foremen and stewards, lack of ability to designate from the bench the better workers as in a "call by name" system found in other venues, and inability to supervise the workers under the work rules. This resulted in exhibitors taking less space at the trade shows.]; Appendix "C", n.t. Casper, at pp 71-73 [Under the 1983 Carpenter Union CBA, the Carpenters were allowed to work much slower than members of the Painter's Union doing the same tasks, resulting in exorbitant labor costs for exhibitors, which in some instances, amounted to the Carpenters charging 60% or more than the Painter's Union for the identical work, or forcing needless overtime for Carpenters at premium rates]; Appendix "C", n.t. Casper, at pp 76-77 [Carpenters work rules and costs aggravated exhibitors who ended up taking less booth space from the Show Producers due to their fixed budgets.]; Appendix "O", Affidavit and Report of Patrick Perrino at pp. 5 [Exhibitors with fixed budgets had to pay higher costs for labor that were passed on by show contractors working under the 1983 Carpenter Union CBA resulting in smaller booth space being rented from the Show Producers, and decreased revenue earned by them], Appendix "O", Affidavit and Report of Patrick Perrino at p. 7 [The provisions in the 1983 Carpenter Union CBA providing for double time on weekends when most shows move in and out, built in payments to nonworking Carpenters, higher wage and benefit payments than the rates paid to comparable workers doing the same work had a negative impact on exhibitors and show producers.]

### 3.   The 1983 Collective Bargaining Agreement was Unworkable and Onerous in the Modern Trade Show Setting and it was Abandoned by the Parties

The 1983 Carpenter Union CBA covered without any differentiation, in-house, full time employees who performed maintenance tasks, construction workers building new edifices and occasional trade show workers who set up the shows and handled exhibits in Boardwalk Hall. Because the 1983 Carpenter Union CBA was geared toward every conceivable type of job that the Carpenter Union's members might be assigned to, there were many terms that were not suited to trade show work, and hurt the Atlantic City Convention Center when compared to its competition..[41]

Most troubling to the trade show industry was the fact that under the 1983 Carpenter Union CBA, the ACCCA was both the employer of the Carpenters and the landlord.[42] The ACCCA's status as employer of the Carpenters coupled with the restrictions in the Lease (Appendix A, p.1-1, at §19) meant that if exhibitors wanted to use their own staff to set-up their exhibits, the Carpenter Union could stop this under the strict "no-subcontracting" provision of the 1983 Carpenter Union CBA.[43]

---

[41]     *See*, JA680; Appendix "E", n.t. McClintock, at pp.173, 174-180,198;  For example, the 1983 Carpenter Union CBA provided the following: Article XIV **"Hours of Work"** (JA401) 8:00 to 4:00; Article XX **"Overtime and Holiday Work"** (JA402) stated that all work not between 8:00 and 4:00, Saturday and Sunday and holidays were deemed overtime, and paid at **twice** the normal rate; Article XXVIII **"Non-Working Foremen"** (JA 409) stated that whenever there were 2 or more Carpenters working there was a non-working foreman;  Article XVII **"Show up Time"** (JA 401) stated that employees guaranteed 2 hours of pay even if not working; Article XVI **"No Subcontracting"** (JA400) stated  that all covered work "shall be performed by the [ACCCA's] employees only, and will not be performed by the subcontractors of the [ACCCA], or its tenants or contractors or subcontractors of subtenants."

[42]     Appendix N, p.1-241   SMG893; Appendix N, p. 1-247 SMG1413; *See,* also, Appendix "E", n.t. McClintock, at p.13-16.

[43]     Appendix "E", n.t. McClintock, at p.186; Article XVI (JA400) This *no-subcontracting*  language in the 1983 Carpenter Union CBA is further evinces that  the April 15, 1999 Agreement did not reference, even by implication, the 1983 Carpenter Union CBA; and further, the April 15th Agreement proves the 1983 Carpenter Union CBA was neither a viable legal document or pertinent to the factual situation extant in 1999. If the 1983 Carpenter Union CBA's *no-subcontracting* clause was still governing, SMG would not be allowed to give up the work. (Perhaps when the April 15th Agreement was written, SMG was contemplating a revision of  the language in its License that would revert back to the days when the operator of the facility hired the labor and re-sold it to the Show Producers. In that event, the language in the April 15th Agreement that mentions "subcontracting" might have some relevance and force. However, SMG elected to not revert back to the old way, and instead, entered into the

**4.    The 1983 Carpenter Union CBA was <u>Not</u> Renewed in Accordance with its Terms, and it was Abandoned by the Parties which Operated Under *Ad Hoc*, Informal, Temporary Arrangements**

The 1983 Carpenter Union CBA, at Article XXI[44] provided for its termination on April 30, 1986 unless there was 90 days notice prior written notice to negotiate changes, and a written renewal.[45] In accordance with its terms, 1983 Carpenter Union CBA was renewed for one year extensions in the years 1987 through 1990.[46] However, after the one year renewal in 1990, there were no further written renewals.[47] Indeed, McClintock admitted that from the time he arrived in Atlantic City, in July of 1995,[48] the 1983 CBA with the Carpenter Union "was not renewed in writing".[49]

During his time running the Atlantic City Convention Center, McClintock never sent to or received written notice from the Carpenter Union concerning the renewal of the 1983 CBA.[50] Furthermore, McClintock never could find a written contract signed by the Atlantic City Convention Center and the Carpenter Union during the period 1992 through 1996 (when the POA was implemented)[51] Another factor is that none of the documents negotiated and written by McClintock in 1995 and 1996 concerning contracts and future contracts with the Carpenter

---

agreements with the Show Producers mention previously, with the result that it ceased being an employer.) Clearly, the License agreement between SMG and the Show Producers is the driving document. SMG had the right to make itself the employer of the Carpenters and to re-sell the Carpenters' labor to the tenant Show Producers; or it could proceed as it actually did, and claim <u>no</u> right to be the employer. SMG's election meant that under the signed License, it had no right to tell its tenant Show Producers what labor to use. The facts and the legal relationship SMG chose to create with its Show Producers proves the 1983 Carpenter Union CBA was a dead hand and by 1999, the Carpenter Union could enforce no legal right to make Show Producers use Carpenters in the Atlantic City Convention Center.

[44]    *See* also, ALJ Schlesinger, Decision, reproduced in the Appendix at JA8, JA14 (summarized, *supra*.) JA410

[45]    JA388, 410; Appendix "E", n.t. McClintock, at 101-102; Appendix "E", n.t. McClintock, at p.195 [McClintock admitted the agreement required a renewal every year.] Appendix "E", n.t. McClintock, at p,196 [McClintock not aware of anything that would extend the term of the 1983 Carpenter Union CBA longer than what it said.]

[46]    JA738-733

[47]    JA157-158

[48]    Appendix "E", n.t. McClintock, at pp. 8-9

[49]    Appendix "E", n.t. McClintock, at p. 58

[50]    Appendix "E", n.t. McClintock, at p. 102

[51]    Appendix "E", n.t. McClintock, at p.109

Union, in 1995 and 1996 mentioned the 1983 CBA.[52] McClintock instead wrote repeatedly that

a written contract between SMG and the Carpenter Union had to be negotiated and written.[53]

In 1995, Jim Kutch an employee in the finance office of the Atlantic City Convention and

Visitors Authority who was responsible for payments concerning the Atlantic City Convention

Center prepared a memorandum of all the current labor contracts in force concerning the Atlantic

City Convention Center, and he wrote about the Carpenter Union, "The ACCCA does not have

contracts with individual trades. [The term "trades" includes the Carpenter Union] ACCCA

abides by terms of the contracts negotiated with the trades by the Building Contractors

Association of South Jersey.[54]

### 5.     The 1983 Carpenter Union CBA was Replaced by the Written "Chairman Francis" Agreements that Superseded and Contradicted It

The formal interment of the 1983 Carpenter Union CBA came in the form of a meeting

between the Chairman of the NJSEA, Michael D. Francis and the labor unions and a letter

agreement dated March 23, 1994 that came out of the meeting.[55] The letter agreement was

signed by the Carpenter Union[56], and it stated that "casuals" (referring to on-the-floor trade show

laborers) would work under the casino hotel agreements after the new Atlantic City Convention

Center was opened.

When McClintock was asked if that was not a signed contract that superseded the 1983

Carpenter Union CBA, McClintock's only answer was that he was aware of the signed Chairman

Francis letter agreement, but he did not know why it had been signed by the Carpenters.[57]

McClintock also conceded that Chairman Francis spoke for the NJSEA and it could give orders

---

[52]     Appendix "E", n.t. McClintock, at p.110
[53]     Appendix "E", n.t. McClintock, at p.111
[54]     Appendix N, SMG 895 see, Kutch Affidavit, in Appendix "A"
[55]     JA680
[56]     Appendix "E", n.t. McClintock, at p.55
[57]     Appendix "E", n.t. McClintock, at pp.201-204

and make agreements concerning the Atlantic City Convention Center.[58] In other words, the Chairman Francis letter agreement destroyed defendants' neat story, and McClintock could offer no credible explanation to explain away this additional evidence of the expiration and termination of the 1983 Carpenter Union CBA.

### 6.    The 1983 Carpenter Union CBA was Superseded by the Written Project Only Agreement ("POA")  which Contradicted the 1983 CBA

Perhaps the best proof of the fact that the 1983 Carpenter Union CBA was no longer a legally binding document is found in the opening statement of James Mathews Esquire, at the NLRB hearing.  Mr. Mathews was representing SMG, and in his statement, he discussed the contracts between SMG and the Carpenter Union.  Significantly, he did not mention the 1983 Carpenter Union CBA.[59]

Mr. Mathews was speaking about a written agreement dated October 28, 1995 called the "Project Only Agreement," or sometimes referred to as the "POA".[60]  Under the POA, SMG agreed to comply with the Collective Bargaining Agreement  of the Building Contractors Association of New Jersey (B.C.A.)[61] McClintock, who helped write the POA,  agreed that

---

> "Between '95 and '97. the parties began negotiations for a new set of agreements for the operations and maintenance of the in-house stable work force. That's over here. The other agreement that was entered into was what is called the Project Only Agreement. Which you will see in evidence. It is, in essence, the B.C.A.., Building Contractors Association Agreement.  It covers **all of the contractors' work not covered by the O&M Agreement**, which means renovations and **show work.** So there is a contract for that. The parties did exchange a letter saying that we are going to try to negotiate a third agreement, to carve the show work out  of the Project Only Agreement, we are going to continue talking about that, but the one and only change that we will make in the historic B.C.A. terms  and conditions of the show work is, we will permit subcontracting so long as the subcontracting is through a Carpenter's signatory." (Emphasis added)

[60]    JA769
[61]    The Building Contractors Association Agreements (B.C.A.) were quite different from the 1983 Carpenter Union CBA.

usually agreements between SMG and the Carpenter Union were in writing.[62]  And that there

was no writing that limited the text of the POA or its subject matter to less than what was stated

there.  McClintock admitted that if SMG or the Carpenter Union wanted to limit the POA to

adopting just the "economic terms" of the B.C.A. and to leave in place the other terms of the

1983 CBA, the parties knew they could have written that in the POA, but elected not to write that

in.[63]  SMG followed the POA, and paid the Carpenter Union for show work according to the

B.C.A. pay scale in force at the time.[64]  Hence, the B.C.A. replaced the 1983 Carpenter Union

CBA.  Its terms contradicted many of the key provisions that were objectionable in the 1983

Carpenter Union CBA.[65]

   Significantly, the POA did address specifically the issue of show labor, but it did so in a

way that refuted the viability of the 1983 Carpenter Union CBA.  Thus at

¶ 6, the POA stated that it would not prejudice the rights of the parties under the O&M

agreement or "any Show Labor Agreement which might be negotiated between SMG & the

---

[62]     Appendix "E", n.t. McClintock, at p.82.  Interestingly, in light of his statement about writings, McClintock admitted that from the time he arrived in Atlantic City, in around  July of 1995,  the 1983 CBA with the Carpenter Union "was not renewed in writing".  Appendix "E", n.t. McClintock, at p. 58; 8-9.

[63]     Appendix "E", n.t. McClintock, at p.83. McClintock conceded also that the POA did not state anything that would indicate anything but that the full terms and provisions of the B.C.A. would govern the contractual relationship between SMG as manager of the Atlantic City Convention Center and the Carpenter Union. Appendix "E", n.t. McClintock, at pp. 84-85.  Furthermore, the POA said at ¶ 6 that it represented the entire understanding of the parties with regard to the subjects , and that the POA "supersedes and cancels all previous negotiations, agreements, commitments and writings in connection herewith."  Moreover, the POA, at ¶6 said could not be amended or changed except by a signed written document.  McClintock admitted that if there was a limitation on the extent or application of the POA that was not included in the POA itself, ¶ 6 would not allow it. Appendix "E", n.t. McClintock, at p. 87.

[64]     Appendix "E", n.t. McClintock, at pp. 88-90

[65]     This is evident when one compares the 1983 Carpenter Union CBA (JA388) with the B.C.A. (JA536).  The work rules, and procedures are not the same throughout the two documents.

   When asked at the NLRB hearing if the Project Only Agreement (JA769) required the Carpenters to bring their own tools, McClintock answered, "It references other agreements for that type of information."  (JA200) However, the Project Only Agreement (JA769) by its terms, referenced only the B.C.A. Collective Bargaining Agreement. (JA 769 at ¶1) stating that SMG agrees to comply with the terms and conditions stated therein. Accordingly, there can be no argument that if under the Project Only Agreement one had to consult the Building Contractors Association Collective Bargaining Agreement to determine if Carpenters had to bring their own tools, one would have to consult that agreement for all other terms. Moreover, that is exactly what the Project Only Agreement said. It is significant that McClintock did not state in the POA that any of the terms from the 1983 Carpenter Union CBA were applicable.

Carpenters District Council of South Jersey and its Local 632, collectively the "In-House Agreements."[66]   There never was a "Show Labor Agreement," and the fact that the POA did not mention the 1983 Carpenter Union CBA (which defendants want us now to believe was in fact, a "Show Labor Agreement" that was supposed to be in force at the time the POA was drafted and signed), leads only to the conclusion that the parties knew that the 1983 Carpenter Union CBA was not in force.

### 7.   The April 15th Agreement did not Resurrect the 1983 Carpenter Union CBA, and There was no Basis to Apply it to AES

We have discussed previously, the pertinent changes in the language of the between the *Lease* agreement the ACCCA gave to Show Producers when the 1983 Carpenter Union CBA was still in force,[67] and the decidedly different *License* agreement that SMG gave to the Show Producers after the 1983 Carpenter Union CBA was no longer in effect.[68]   We demonstrated that the License that SMG prepared for the Show Producers changed the text from the ACCCA Lease to reflect that SMG was not the employer of the Carpenters, and that the Show Producers had to make their own arrangements for hiring show labor. (*See*, discussion, *supra*.)

Defendants nonetheless argue that because §19 of the License has boilerplate language where the Show Producers agreed not to violate or jeopardize any SMG labor agreement, SMG and the Show Producers supposedly have agreed that the Show Producers were legally bound to use Carpenters. The record rejects defendants' argument, and on the contrary, shows that during the Liability Period, SMG was not the employer of the Carpenters under any agreement involving trade shows, and had no agreement with the Carpenters that would interfere with the Show Producers choice of workers. (*See*, discussion, *infra*.)

---

66   JA769
67   Appendix A at, p.1-1.
68   JA480

Furthermore, to the extent that defendants argue that the letter agreement between SMG and the Carpenter Union dated April 15, 1996 ("April 15th Agreement")[69] imposed a requirement on Show Producers to use Carpenters, a careful reading of the April 15th Agreement alongside of the License that SMG had the Show Producers sign[70] establishes that the April 15th Agreement is inapposite: by its own terms, the agreement would never be activated unless "SMG subcontracts the covered work".[71] However, as discussed, the License SMG entered into with the Show Producers (JA480) says that it is the responsibility of the Show Producers to hire their own labor. Based on the language in the License, SMG would not be recognized under the law as the employer of the show labor, and likewise could not be recognized legally as a "contractor" that was "subcontracting" the labor to either the Show Producers, or to the Show Contractors hired by the Show Producers.[72]

SMG's change of the terms written in the ACCCA Lease when it wrote its License proves that while the ACCCA recognized it was bound by the 1983 Carpenter Union CBA, and therefore, in its agreements with the Show Producers, it made sure that it not reserved the right to provide Carpenters in accordance with its obligation under the 1983 Collective Bargaining Agreement, when SMG assumed the helm, it recognized no such obligation to use or employ the Carpenters (under the 1983 Carpenter Union CBA or otherwise), and its License agreement with the Show Producers reflected that fact.

---

[69]   JA386
[70]   JA480
[71]   JA386 (Emphasis added)
[72]   *See*, ALJ Schlesinger, Decision, reproduced in the Appendix at JA8 [SMG does not seek to regulate the use of Carpenters as its own employees, but rather it seeks to regulate the labor policies of other neutral employers.]. *See*, also, ALJ Schlesinger, Decision, JA14 [SMG not involved in the hiring of its own employees at trade shows because it ceded all responsibilities to the show producer and their service contractors; and it had no control over the employees of the service contractors.]

**E.    SMG Planned and Used its Monopoly Power in Combination with the Carpenter Union to Implement a Scheme that Resulted in the Carpenter Union's 7 County Lock-up that Restrained the Business and Trade of the Atlantic City Based Local Show Contractors**

**1.    SMG Wanted to Terminate its Role as the Employer of the Carpenters and to do that Without Facing Labor Unrest at the Atlantic City Convention Center, it Used its Market Power to Sacrifice the Show Contractors to Appease the Carpenter Union**

SMG did not want to be in the role as a hiring hall for Carpenter Union workers because

it was costing the Atlantic City Convention Center money.[73] To extricate itself from the

Carpenter Union, SMG planned and then with the willing collaboration of the Carpenter Union,

implemented a scheme that achieved the following restraint:

> Here SMG determined not to be involved in the hiring of
> employees to work trade shows. Rather, it ceded all responsibilities
> to the show owner and producer, the exhibitors, and their service
> contractors; **and at the time that it threatened AES for
> improperly assigning work it had no control over AES's
> employees.**[74]

The evidence shows that as early as 1995, when it first arrived at the Atlantic City

Convention Center, SMG planned to have the Show Contractors become the employers of the

Carpenters instead of SMG.[75] Most telling is a memo from McClintock to his file dated January

---

[73]    Appendix "E", n.t. McClintock, at p. 39-40
[74]    ALJ Schlesinger, Decision, reproduced in the Appendix at JA8.
[75]    SMG 893 [Inter Office Memo dated 6/9/95 (copy to McClintock) listing existing labor and proposing,
"**Decorators hire exhibit set-up directly**"] (Emphasis added) The memo stated also,
> On May 18, 1995, McClintock and his superior at SMG met with the **New
> Jersey Sports and Exposition Authority (NJSEA)** as well as others involved
> in the Atlantic City Convention Center. The memo says that "The following
> strategy was agreed to in principle by all parties:
> \*                \*                \*
> Our overall objective will be to create a more 'exhibitor friendly' working
> environment in AC...Additionally, SMG would not continue with the practice
> of acting as the hiring hall for all exhibit set-up (carpenter's union) labor. We
> would sight (*sic*) industry standards and practices which assign the responsibility
> of hiring exhibit labor directly to the decorators."

There is a strong hint about why SMG could not simply trample the Carpenter Union the same way it ruthlessly
deprived the Painter's Union of its casino work, or forced the Show Contractor to accept the Carpenter Union's 7
County Lock-up. The memo notes that SMG's boss, the NJSEA, "was concerned that it would support the

17, 1995. McClintock wrote that he had met with people from Freeman Decorating Company to discuss the current and future labor situation at the Atlantic City Convention Center.[76] In that discussion, he learned and wrote in his memo that: The existing policy of SMG employing Carpenters was a strong negative for Show Contractors, and, "Should SMG decide to no longer provide carpenters to decorators established (sic.) jurisdictional guidelines, would most likely force decorators to negotiate with carpenters." The seed of the plan can be seen in this January, 1995 memo. Most telling is the next to last line of the memo where McClintock wrote:

> "-Carpenters agreement would be City wide. Currently decorators use drapers union in casinos."[77]

The evidence thus discloses that in January of 1995, SMG was scheming to manipulate the Show Contractor into hiring the Carpenters so SMG could get out of the hiring hall business, and that SMG understood that it would have to force the Show Contractors to stop using labor from the "drapers" when they did trade shows in the casinos, and to accept the Carpenter Union on a "City wide" basis. It took SMG about four years to see the results, but its single-minded dedication to its plan, and the collaboration of the Carpenter Union brought it o fruition. What is stunning is that SMG had no qualms about using its power to trample the drapers union, the Show Contractors and ultimately the Painter's Union, the casinos. the Show Producer and the exhibitors, all of whom suffered by having their right to negotiate and select the most meritorious

---

proposition, but it cautioned about taking any action at time that might cause the Carpenter Union to "disrupt construction work on the new center"'.(*Id*) The answer to that riddle may very well be that while the new Atlantic City Convention Center was being built, SMG was instructed to handle the Carpenters, who were building the new facility, with kid gloves to avoid any delay in the construction by a disgruntled union. It is interesting to observe that SMG delayed its decision to stop being an employer of Carpenters for show labor until after the new Atlantic City Convention Center building was completed. At that point, it simply took off the kid gloves and announced to the Carpenters that they would no longer be employed by SMG. If SMG did not get a benefit in the form of leveling the playing field with the casino hotels for the common shows, there may never had been any coercion by SMG for Show Contractors to agree to the Carpenter Union's 7 County Lock-up.

[76]      Appendix N, SMG 1413
[77]      *Id.*

show labor taken away as the price of the Show Contractors being allowed to work on the floor of the Atlantic City Convention Center.

### 2. SMG Accomplished its Ppurpose of Leveling its *Carpenters-Burdened* Playing Field for Common Shows, and thus Increased the Number of Smaller Shows it Booked Following the 7 County Agreement's Requirement that Show Contractors had to Use the Carpenters for Trade Shows Held in the Atlantic City Casino Hotels

The Atlantic City Convention Center has five Exhibition Halls that total 486,600 square feet,[78] and in addition, there are numerous smaller meeting and exhibition spaces.[79] No other venue in Atlantic City has exhibit space that is near the size of the Atlantic City Convention Center.[80] In fact, the next largest trade show venue in the Atlantic City area is the Mark Etes Arena in the Taj Mahal, and it has exhibition space that totals less than 100,000 square feet.[81]

There are "<u>**Convention Center Only Shows**</u>" in the Atlantic City market for hosting trade shows and events which, because of the space that is needed, can be held only at the Atlantic City Convention Center.[82] On the other hand, there are certain "<u>**Common Shows**</u>" which are smaller trade shows and events that could be held at either the Atlantic City Convention Center, at casino hotels or at another venue in Atlantic City.[83] Accordingly, a **Convention Center Only Shows**, for definitional purposes, is one that requires 100,000 square feet.

With the discovery documents, it is possible to calculate whether SMG increased its bookings of **Common Shows** following the implementation of the Carpenter Union's 7 County Lock-up. These discovery documents are as follows:

---

[78]   Appendix "N" p.1-245, SMG1339
[79]   Appendix "E", n.t. McClintock, at pp.154-1550
[80]   Appendix "E", n.t. McClintock, at pp.155-156
[81]   Appendix "E", n.t. McClintock, at p.155
[82]   Appendix "E", n.t. McClintock, at pp. 221-222
[83]   Appendix "E", n.t. McClintock, at p.219, 221-222

• SMG produced a document known as the "Pre-Opening Rate Schedule" that lists the square footage for the Atlantic City Convention Center's Halls.[84]

• In a document marked in discovery as "SMG137" there are lists showing every show and event for the years 1998, 1999, 2000 and 2001.[85]

Using SMG137 together with the information found on the Pre-Opening Rate Schedule, and using the definitions for **Convention Center Only Shows"** and **"Common Shows,"** mentioned above, we find the following breakdown:

| Chart Showing SMG's Increase in Common Shows After the 7 County Agreement | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1998 | | 1999 | | 2000 | | 2001 | |
| Total shows and events | 254 | Total shows and events | 256 | Total shows and events | 339 | Total shows and events | 347 |
| **Convention Center Only Shows** requiring more than 100,000 ft. | 35 | **Convention Center Only Shows** requiring more than 100,000 ft. | 35 | **Convention Center Only Shows** requiring more than 100,000 ft.. | 37 | **Convention Center Only Shows** requiring more than 100,000 ft. | 31 |
| **Common Shows** | 219 | **Common Shows** | 221 | **Common Shows** | 302 | **Common Shows** | 316 |

Given that the Show Producers needed some lead time to plan, it is appropriate to consider the information reported for 1998 and 1999 as the **pre-7 County Agreement period** because bookings would be made generally in advance.[86] By the same logic, the years 2000 and 2001 can be considered the beginning of the **post-7 County Agreement** period. The chart shows that larger, **Convention Center Only Shows** averaged about 35 shows per year across all

---

[84] Appendix "E", n.t. McClintock, at p. 224; Appendix "N" p. 1-245, SMG1339. The Pre-Opening Rate Schedule was sent out to Show Producers to sell them space in the Atlantic City Convention Center, and it is consistent with McClintock's testimony describing the size and physical layout of the Atlantic City Convention Center. (Appendix "E", n.t., McClintock at pp. 155-157, 296).

[85] Appendix "N", p. 1-194, SMG137. These documents were used by McClintock when he was running the Atlantic City Convention Center. (Appendix "E", n.t., McClintock, at p. 225)

[86] The 7 County Carpenter Union Agreement (JA 411) is dated May 1, 1998 but according to the testimony, it was not completely negotiated and signed until July of 1998; and SMG did not send its official notice about the agreement to the Show Producers and Show Contractors until August 18, 1998. (JA382)

periods. On the other hand, the number of smaller, **Common Shows** that SMG was able to book increased by 37% in 2000 and by 47% in 2001. The inescapable inference from the evidence is that SMG's persistent efforts to force the Show Contractors to use Carpenters in the casino hotel venues (with which the Atlantic City Convention Center had trouble competing when it was the only venue saddled with the Carpenter Union) paid off with a dramatic increase in the number of smaller, **Common Shows** SMG was able to book following the implementation of the Carpenter Union's 7 County Lock-up.

### F.    Plaintiff's Antitrust Contentions

#### 1.    Illegal Tying Arrangement – General Discussion

A tying arrangement is an agreement by a party to sell one product or service, but only on the condition that the buyer also purchases a different (or tied) product or service. *Northern Pac. Ry. v. United States*, 356 U.S. 1 (1958). Illegal tie-ins are those which "harm competing sellers of the tied product by foreclosing them from access to the market for reasons having nothing to do with the merits of the tying seller's product, and harm buyers by restricting their range of choice in the tied product market. *Anderson Foreign Motors, Inc. v. New England Toyota Distrib., Inc.*, 475 F. Supp. 973, 980 (D. Mass. 1979) (*citing Northern Pac. and Times-Picayune Pub. Co. v. United States*, 345 U.S. 594 (1953)). "[T]he essence of illegality in tying agreements is the wielding of monopolistic leverage; a seller exploits his dominant position in one market to expand his empire into the next." *Times-Picayune*, 345 U.S. at 611. See also *Jefferson Parish*, 466 U.S. 2, 27 (1984)("Tying arrangements need only be condemned if they restrain competition on the merits by forcing purchases that would not otherwise be made.").

The legality of tying under the Sherman Act may be analyzed either in terms of the per se rule or the rule of reason. To show a per se violation, the plaintiff must establish three elements:

1) that there exists an actual tie between two separate products; 2) that the seller has sufficient economic power in the market for the tying product to force consumers to accept the tied product; and 3) that a not insubstantial amount of interstate commerce in the tied product is affected. See, e.g., *Northern Pac.*, 356 U.S. 1, 5-6 (1958); *Jefferson Parish*, 466 U.S. at 20-29; *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realt*ors, 850 F.2d 803, 814 (1st Cir.), *cert. denied*, 488 U.S. 955 (1988); *Action Ambulance Service, Inc .v. Atlanticare Health Services, Inc.*, 815 F. Supp. 33, 35-37(D. Mass. 1993). Once a plaintiff has established the three elements of the per se test, anti-competitive effect on the market for the tied product is presumed and its actual scope need not be shown.[87]

The difference between the two lines of inquiry is that under the rule of reason, but not under per se analysis, the plaintiff "has the burden of proving that the [challenged practice] violated the Sherman Act because it unreasonably restrained competition." *Jefferson Parish,* 466 U.S. at 29.

Plaintiff satisfies the test for a *per se* tying claim. But if that view is not shared by the Court, Plaintiff still has a valid tying claim under the rule of reason. When examined under the framework of the Sherman Act, AES wanted to do work in the Atlantic City Convention Center under the same relaxed work rules available to all of the Show Contractors that signed the Carpenter Union's 7 County Lock-up (the desired product). However, in order to obtain the desired product, it had to agree to use the Carpenters in the seven Southern New Jersey counties. From a tying perspective, this was the undesired product. SMG had the both the market power to enforce the tying arrangement as well as the knowledge that no regional Show Contractor like AES could afford to not work for Show Producers who held trade shows in the Atlantic City

---

[87]   However, the per se plaintiff must still "make some minimal showing of real or potential foreclosed commerce caused by the tie, if only as a matter of practical inferential common sense." Wells Real Estate, 850 F.2d at 815 n.11.

Convention Center. Moreover, SMG anointed the Carpenter Union with a monopoly over the sale of show labor at Convention Center Only Shows, and it imposed its own tying arrangement: AES could hire Carpenters to work at the Atlantic City Convention Center and thus satisfy SMG (the desired product), but only if it agreed to hire Carpenters, exclusively, at the casino hotels, and everywhere else that AES got jobs in the seven counties.

### 2.   Description of Market for Tying Product

A tying case requires two markets. Assuming that SMG had the right to insist that Show Contractors use Carpenters, the desired, tying product would be Carpenter labor at the Atlantic City Convention at the same price, and with the same work rules that its competitors who signed the Carpenter Union's 7 County Lock-up had.[88] The market for the unwanted, tied product is defined as having to use the Carpenter Union in the seven counties in New Jersey covered by the Carpenters Union's 7 County Lock-up.[89] Of course, the affected seven counties included all of the casino hotels, which provided the main competition to the Atlantic City Convention Center for smaller shows in Atlantic City. The evidence showed that before the April 15th Agreement, the Carpenter Union had little or no market share for smaller trade shows held in casino hotels and other venues in Atlantic City. The enforced tying requirement gave Show Contractors with any level of substantial business in the casino hotels the Hobson's Choice of binding themselves to use Carpenter Union workers in the smaller shows held in Atlantic City casino hotels (as well as elsewhere in the seven counties), or incur the harsh penalty of having the 1983 Carpenter Union CBA imposed on them when the serviced shows at the Atlantic City

---

[88]   If SMG did not have the legal right to require Show Contractor to use Carpenters, the tying product would be gaining access to perform services for a Show Producer with a License to hold a show at the Atlantic City Convention Center, and the tied product would be having to use the Carpenters. While this sounds like a tautology it is because then the case would be transformed into a naked refusal to deal.

[89]   Or stated otherwise, having to buy Carpenter labor in the seven counties whenever the Show Contractor did a show.

Convention Center. The tying arrangement allowed the Carpenter Union to illegally leverage its monopoly control over the market for larger shows that had to be held in the Atlantic City Convention Center, to make gains in the "tied" market for trade shows held outside of the Atlantic City Convention Center.[90]

SMG manipulated Show Contractors into choosing the Carpenter Union for large shows in Atlantic City that could be held only at the Atlantic City Convention Center. SMG penalized any Show Contractors who resisted signing the 7 County Carpenter Union Agreement through the forced imposition of the exact same Carpenter workers, but instead of being paid the lower rates and working under the more friendly work rules of the Carpenters Union's 7 County Lock-up, the contractors were forced by SMG to pay the Carpenters in accordance with the onerous terms of the 1983 Carpenter Union CBA. The defined relevant market for the tying product of show labor services at the Atlantic City Convention Center was fettered unreasonably due to the monopoly that SMG gave to and enforced for the Carpenters. The Carpenter Union was the sole seller in the tying market, and the Show Contractors were the buyers. The Show Contractors wanted, and indeed, needed to be able to perform services for their Show Producer and exhibitor customers that had preexisting agreements to put on trade shows at the Atlantic City Convention Center. But the Show Contractors had no choice about which union or labor supply they could use in the Atlantic City Convention Center.

Indisputably, SMG bequeathed to the Carpenter Union, unique control over the market for labor used at the larger shows that could physically be held in Atlantic City in no facility

---

[90]   As discussed above, before SMG rigged the game, the Carpenter Union had been unable to compete for shows in the Casino hotels and venues outside the Atlantic City Convention Center because the Show Contractors had, categorically, exercised their free-market choice to select the Painter's Union and other sources of labor that offered rates and services they found more attractive than what was offered by the Carpenter Union. As we showed from the record, the Carpenter Union did not have even a single collective bargaining agreement with a Show Contractor in the Atlantic City Geographic Market until SMG empowered it by holding the right to do shows in the Atlantic City Convention Center hostage.

other than the Atlantic City Convention Center.  In antitrust jargon, the Carpenter Union had

been graced by SMG with monopoly power over the labor services being sold in the market of

shows held in the Atlantic City Convention Center.  "When a product is controlled by one

interest, without substitutes available in the market, there is monopoly power." *United States v.*

*E. I. du Pont de Nemours & Co., 351 U.S. 377, 394 (1956).* See, *e. g., Jefferson Parish Hospital*

*Dist. No. 2 v. Hyde, 466 U.S., at 24-25; Northern Pacific R. Co. v. United States, 356 U.S., at 7-*

*8; Times-Picayune, 345 U.S., at 611-613.*

### 3.    Injury to Competition Caused by the Tying Arrangement

The injury to competition caused by this tying arrangement was manifold and manifest.

The evidence showed that competing sources of labor, such as the Painter's Union, the Stage

Hands Union and non-union staff charged the Show Contractors much lower rates for wages and

benefits, and had work rules that were less costly and more efficient in the eyes of the Show

Contractors.[91]  The tying arrangement thus pegged upwardly the prices for show labor in the tied

market.  In addition, it perpetuated the use of less efficient Carpenters in the tied market where

they would not otherwise have been chosen.[92]

Besides eliminating the ability of the Show Contractors to select their sources of labor,

and to obtain labor at a bargained-for lower price from their suppliers of choice, the large scale

acquiescence by Show Contractors to SMG's coercion deprived the Painter's Union and other

sources of labor the chance to compete in the tied market.

Any Show Contractor who wanted to be able to hire show labor at the Atlantic City

---

[91]    Appendix "G" Perrino Expert Report and Affidavit
[92]    As discussed, the Show Contractors viewed the Carpenter Union workers as less efficient.  Hence, as noted,
before April 15th Agreement, and SMG's resulting coercion that forced on the Show Contractors the choice of
either the Carpenters Union's 7 County Lock-up, or the oppressive rates and rules in the 1983 Carpenter Union
CBA, the Show Contractors, voluntarily (and en masse), elected to not use the Carpenter Union workers in the tied
market. (*See*, also, Appendix "G" Perrino Expert Report and Affidavit)

Convention Center without incurring the higher rates and being governed by the unfriendly 1983 Carpenter Union CBA work rules was obliged to use Carpenter Union, to the exclusion of the Painter's Union and other sources in the tied market. Therefore, the first level of buyers (Show Contractors) suffered an injury to competition as did competitors to the Carpenter Union (e.g., Painters, Stage Hands and other sources of labor) who were restrained from competing in the tied market on the merits of their prices, efficiency and work rules.

The tying arrangement caused other injury to competition also because it weakened the Painter's Union due to the drying up of jobs for its workers in the Atlantic City trade show market on the one hand, and made them off-limits to all Show Contractors who signed the Carpenter Union's 7 County Lock-up. Still another injury to competition was that the tying arrangement artificially increased the cost of labor for all Show Contractors who worked for Show Producers at either the Atlantic City Convention Center, or anywhere else in the seven New Jersey counties. This increased cost was passed on to the Show Producers.[93]

The higher labor cost was passed on also to the exhibitors who had no choice but to use the Show Contractors hired by the Show Producers. Even if the Show Contractors did not pass on the increase in every instance, the fact that they were not able to buy labor at a price set by the free market, but rather had to buy it a price set artificially by SMG and the Carpenter Union, the potential for artificially increased prices being passed on to the Show Producers and exhibitors cannot be denied.

There were additional ramifications from this illegal tying arrangement: Exhibitors had limited budgets for trade shows, and if their labor costs were increased, they would have less money to buy booth space from the Show Producers. This meant that exhibitors could not fully

---

[93] Every Show Contractor suffered some form of cost increase, either due to having to use Carpenters in the seven counties at rates that were higher than what they were paying to the Painter's Union, or paying the 1983 Carpenter Union CBA rates for shows in the Atlantic City Convention Center.

display their products at trade shows due to smaller space and Show Producers would receive less revenue and profits because the Show Producers *raison d'ê tre* was to re-sell the space they rented from SMG at the Atlantic City Convention Center. If the exhibitors were taking less space, and if the Show Producers needed to make a minimum sum from their shows, the likely remedy for the Show Producers would be to increase the price of the space it sold to exhibitors. Therefore, the tying arrangement had a rippling effect resulting in a prolificacy of artificial price increases.

A toxic impact on the natural state of competition was that through the device of the tying arrangement, SMG was able to leverage its monopoly for large trade shows in Atlantic City since the Atlantic City Convention Center was the only venue large enough to house large shows to gain a better competitive position in the market for renting space to the smaller shows. The tying arrangement leveled the playing field by imposing Carpenter Union on the smaller shows in Atlantic City regardless of the venue since most of the Show Contractors in Atlantic City had signed the 7 County Carpenter Union Agreement. Therefore, the tying arrangement helped SMG carve out a larger share of the small show market from what the casino hotels had enjoyed by spreading the misery of the Carpenter Union to the casino hotels via the 7 County Carpenter Union Agreement it enabled the Carpenter Union to extract from the Show Contractors in Atlantic City.

### 4. There is no Requirement in a Tying Case that the Defendants Participate in the Markets for Both the Tying and the Tied Product

In *Action Ambulance Service, Inc. v. Atlanticare Health Services, Inc.* 815 F. Supp. 33 (D. Mass 1993), the defendant AMC operated the two major hospitals in a city. Through a subsidiary, AMC entered into a partnership with Life-Line, an ambulance company to provide ambulance services to patients in AMC hospitals. The plaintiff, Action, was an independent

ambulance company that alleged an illegal tying arrangement where the desired, tying product was the hospital services, and the undesired tied product was ambulance service.

AMC and Life-Line argued that as a matter of law, an entity cannot engage in illegal tying unless it participates in the markets for both the tying and tied products. (*Action Ambulance Service, Inc.* 815 F. Supp. at 36) Life-Line thus argued that it was not in the business of providing hospital services while AMC argued that did not provide ambulance services. They concluded that these facts meant there could be no successful tying claim against either.[94]

In rejecting this premise, the court in *Action Ambulance Service, Inc.* noted, "Cases involving a single defendant participating in both the tying and the tied markets may perhaps be prototypical, but the evils which the Sherman Act is meant to prevent occur whether the tying is within one firm or by agreement between two firms." The court then analyzed *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2 (1984) and explained why there is no requirement in a tying case that the defendants had to participate in the markets for both the tying and the tied product, saying the defense,

> "is disproved by the factual circumstances of *Jefferson Parish.*
> That case involved an agreement between East Jefferson Hospital
> and the Roux & Associates anesthesiology firm. Pursuant to
> contract, only Roux anesthesiologists were permitted to practice
> anesthesiology at the hospital. Roux was not in the business of
> providing acute care hospital services, nor was East Jefferson a
> participant in the anesthesiology market. Nevertheless, the
> Supreme Court found that the contract between them met the first
> prong of the per se test: "the hospital's requirement that its patients
> obtain necessary anesthesiological services from Roux combined
> the purchase of two distinguishable services in a single

---

[94]    This is the same type of argument that defendants here make: SMG contends it is the manager of the Atlantic City Convention Center, and consequently, it cannot be liable where the unwanted tied product is labor services; and the Carpenter Union is in the labor supply business, and cannot be liable in a tying claim where the tying product is the leasing of space for trade shows.

> transaction." 466 U.S. at 24 ... The Supreme Court gave no
> indication that the fact that Roux and East Jefferson participated in
> different markets affected its analysis in any way."

*Action Ambulance Service, Inc.* 815 F. Supp. at 36-37

### 5.    Concerted Refusal to Deal

Similarly, the conduct of the defendants amounted to a concerted refusal to deal. SMG

had the market power based on the fact that the Atlantic City Convention Center was akin to an

essential facility for a regional Show Contractor such as AES which  had made a large its

investment to enable it to mainly provide show services in the Atlantic City area; and it was one

of many Show Contractors whose business depended on the Atlantic City convention trade.

Moreover, we will show that AES could not survive on a diet of small shows in Atlantic City,

and need to be able to work at the Atlantic City Convention Center.

When SMG made a deal with the Carpenter Union that it would not allow AES to use

Painter's Union workers in the Atlantic City Convention Center, it amounted to an illegal

boycott under § 1 of the Sherman Act. In the refusal to deal aspect of Plaintiff's claim, he relies

on the case law that makes SMG's condition that AES use Carpenters a violation of § 1 of the

Sherman Act given SMG's market power in the relevant geographic market (as defined under

what we have called the Atlantic City Geographic Market), and the relevant product that  SMG

withheld was its refused to rent space to customers of AES unless AES either signed the

Carpenter Union's 7 County Lock-up agreement, or agreed to pay the penalty of having the using

Carpenters under the onerous and costly 1983 Carpenter Union CBA. SMG had no right to reach

into AES' business, and it had no right to use the 1983 Carpenter Union CBA as a stick to beat

AES into submission.[95]

---

[95]    We will show also that the record has evidence that SMG used other tactics to extort an agreement to the
Carpenter Union's 7 County Lock-up from AES, including, telling Show Producers that they should not use AES

The relevant market for a refusal to deal case may be defined by the market from which

the Plaintiff has been denied access. *In Fishman v. Wirtz*, 807 F.2d 520, (7th Cir. 1986) the court

considered antitrust claims of a party who was excluded from purchasing the Chicago Bulls.

One of the claims was a concerted refusal to deal.[96]  In discussing the relevant market, the court

held,

> The defendants are alleged to have unlawfully precluded the
> plaintiffs from entering the market for the presentation of live
> basketball in Chicago, thus ensuring the monopoly for themselves.
> We know of no rule that states that the parties must be in head-to-
> head competition *in* the relevant market (as opposed to head-to-
> head competition *for* the relevant market) before the antitrust laws
> will apply.  In this case, the competitors were bidding to acquire a
> franchise, but they were also bidding to acquire access to a market.
> It is not clearly erroneous to define the relevant market in these
> circumstances as the market to which access is sought. In fact, this
> is how the market   has been defined in such cases as *Otter Tail
> Power Co. v. United States, 410 U.S. 366, 369, 35 L. Ed. 2d 359,
> 93 S. Ct. 1022  (1973)* (competition between prospective suppliers
> of retail electric power; relevant market is electric power in area to
> be served); *City of Mishawaka v. American Electrical Power Co.,
> Inc., 465 F. Supp. 1320, 1325-26 (N.D. Ind. 1979), aff'd in relevant
> part, 616 F.2d 976 (7th Cir. 1980), cert. denied, 449 U.S. 1096,
> 101 S. Ct. 892, 66 L. Ed. 2d 824 (1981)* (same), as well as any
> number of cases concerning distributorships and sales franchises,
> *e.g., Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1110
> (7th Cir. 1984), cert. denied, 470 U.S. 1054, 84 L. Ed. 2d 821, 105
> S. Ct. 1758 (1985)* (relevant market is market for "haulaway
> services in Chicago area"); *Photovest Corp. v. Fotomat Corp., 606
> F.2d 704, 712-14 (7th Cir. 1979), cert. denied, 445 U.S. 917, 100
> S. Ct. 1278, 63 L. Ed. 2d 601 (1980)* (relevant market is drive-
> through retail photo processing in Indianapolis metropolitan area);
> *Sargent-Welch Scientific Co. v. Ventron Corp., 567 F.2d 701, 709-
> 10 (7th Cir. 1977),* [ *cert. denied, 439 U.S. 822, 58 L. Ed. 2d 113,
> 99 S. Ct. 87 (1979)* (relevant market is consumer market for
> electromagnetic microbalances); *see also Annot., 56 A.L.R. Fed.*

---

because they might have labor and other problems; refusing to allow AES to bid for the Miss America Pageant and
the opening of the Atlantic City Convention Center, both of which were controlled by SMG; and paying bogus
grievances filed against AES without allowing AES to defend them-and then surcharging AES for the amounts
SMGT paid to the Carpenter Union to settle the grievances.

[96]     Significant is the fact that the Court of Appeals upheld a market  defined as "the presentation of live
professional basketball" and the relevant geographic market "the Chicago Metropolitan area" (NBA fans who attend
games generally come from a 35 mile radius of the home arena). *Id.* at 531.

> *406* (collecting cases). In all of these cases, the relevant market
> was that to which access had allegedly been foreclosed by the
> challenged conduct, not the market for similar business
> opportunities. We find nothing erroneous in the trial court's
> delineation of the relevant market. (Footnotes omitted)

(Id., at 531-532)

There is another way to analyze the situation from an antitrust standpoint. Because AES had a collective bargaining agreement with the Painter's Union that performed the identical services for AES that the Carpenter Union proposed to perform, AES was seen in the eyes of the defendants as a proxy for the Carpenter Union. This makes AES a competitor of the Carpenter Union on two planes.

Firstly, there is no requirement in the SMG License that a Show Producer hire a Show Contractor as a middleman to buy labor. Therefore, a Show Producer had the option to obtain Carpenters directly from the Carpenter Union, from SMG or from a Show Contractor that agreed to the Carpenter Union's 7 County Lock-up. Inasmuch as the Carpenter Union was selling labor services in competition with AES, they were competitors with it in the real world.

Secondly, as a proxy for the Painter's Union in a zero sum game, if AES were not barred by SMG from using the Painter's Union, the show work would go to the Carpenter Union. In every sense, the Carpenter Union was fighting against the Painter's Union being able to break into the Atlantic City Convention Center since history has shown that given a choice, the Show Contractors usually selected the lower priced, more efficient and more productive Painter's Union over the Carpenter Union for show work. To a great extent, AES was standing in front of the real target when defendants aimed their boycott and tying violations at the Painter's Union. When AES and the Carpenters are properly identified as competitors, the case fits neatly within the holding of *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472

U.S. 284, (1985) that the category of restraints classed as group boycotts includes cases in which

firms with market power boycott suppliers or customers in order to discourage them from doing

business with a competitor. The Court said in *Northwest Wholesale Stationers, Inc*, 472 U.S. at

294,

> "Cases to which this Court has applied the *per se* approach have
> generally involved joint efforts by a firm or firms to disadvantage
> competitors by "either directly denying or persuading or coercing
> suppliers or customers to deny relationships the competitors need
> in the competitive struggle."

The Court held the *per se* rule applies to a refusal to deal case if it is determined that the

boycott had "predominantly anticompetitive effects". *Northwest Wholesale Stationers, Inc.* 472

U.S. at 298. In the instant case, the boycott of AES for not signing the 7 County Carpenter

Union Agreement had no conceivable pro-competitive effects.[97]

### 6.    Defendants' Acts Caused Injury to Competition

Defendants' argument that there has been no showing of injury to competition is based

on a false premise that virtually ignores the facts, and recasts Plaintiff's theory of the case in an

unrecognizable form. Defendants state that when SMG was the employer of the Carpenters,

everyone had to suffer under the onerous Carpenter Union work rules and the higher costs, but

that the Carpenter Union's 7 County Lock-up gave the Show Contractor a choice they did not

---

[97]    The Court in *Northwest Wholesale Stationers, Inc.* had before it a case where the Plaintiff had been
expelled from a wholesale buying cooperative. In considering when the *per se* rule would be applied, the Court
indicated that there would be an anticompetitive effect justifying the *per se* rule if the cooperative possessed market
power or **exclusive access to an element essential to effective competition**. Here, the Carpenter Union had market
power, and exclusive access to the Atlantic City Convention Center (which was essential to effective competition
amongst AES and like regional Show Contractors in Atlantic City) based on its grant of exclusivity from SMG.
Similarly, SMG had market power from its agreement to manage the Atlantic City Convention Center. The purpose
of the refusal to deal with AES was to discourage it from using the Painters instead of the Carpenters both in the
seven counties and the Atlantic City Convention Center. Thus, it is apparent that the boycott here should be judged
under the *per se* test according to the teachings of *Northwest Wholesale Stationers, Inc* as the Carpenter Union
competed with AES in the supply of labor, and was in a dominant position based on its relationship with SMG. Its
agreement with SMG to prevent AES from using its Painters Union employees who competed directly with the
Carpenter Union employees constituted a refusal to deal and boycott that had an unreasonable restraint on
competition.

have before. SMG then states that there was no injury to competition because AES made the choice to keep higher profits from its casino customers, and that the price AES had to pay for that was to pay more than the other Show Contractors when it did work in the Atlantic City Convention Center.

There are numerous flaws in defendants' argument. When SMG was the employer of the Carpenters, it could set the rules. The Show Producers paid rent that included Carpenters labor, and in essence, because the workers were employees of SMG, any rules SMG made would be unilateral, and would not satisfy the joint action required by §1 of the Sherman Act.[98] What SMG did was immune from antitrust scrutiny under the statutory labor exemption. However, SMG paid an intolerable price as the employer of the Carpenters in terms of its competitive position in trying to market the Atlantic City Convention Center. It made the decision in its own interest to stop employing Carpenters. At that point, SMG had no right to insinuate itself into the businesses of the Show Contractor, with whom it was not in privity, and had no direct relationship.

If SMG did not have the power of being the manager of the only venue in the Atlantic City Geographic Market capable of hosting trade shows requiring more than 10,000 square, it would not have been able to get the Show Contractors to sign the Carpenter Union's 7 County Lock-up. It was only the threat of barring them from the Atlantic City Convention Center that caused the Show Contractors, en masse, to change their long standing preference of not using Carpenter Union members in the casino hotels and other venues. Indeed, although it was less expensive for the Show Contractors to do business in the Atlantic City Convention Center after

---

[98]     The Sherman Act, at §1 applies only to agreements between two or more businesses; it does not cover unilateral conduct. *Fisher v. City of Berkeley,* 475 U.S. 260, 266 (1986) ("Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under §1 in the absence of agreement.").

they signed the Carpenter Union's 7 County Lock-up, it became more expensive for them to do businesses everywhere else in the seven counties.

Defendants argue also that there was not a refusal to deal here because SMG was willing to allow AES to do shows at the Atlantic City Convention Center if it complied with its condition that it agree to the Carpenter Union's 7 County Lock-up. Defendants argue also that the refusal to deal just impacted on AES, and created no injury to competition. Defendants are wrong on both counts. A complete refusal to deal is not necessary for a boycott case, and a naked refusal to deal like this is a classic restraint on trade because it has the potential to eliminative a seller of Show Contractor services to buyers, not on the merits of the seller's services or his high price, but on the contrary, because he is primed to offer a lower price. In *Larry v. Muko, Inc., v. Southwestern Pennsylvania Building And Construction Trades Council 609 F.2d 1368* (3rd Cir. 1979), a nonunion builder was picketed by a trade union while he was constructing a restaurant. The owner of the restaurant, who intended to have additional restaurants built, wanted to appease the union. He asked the builder to use union labor in the future, but the builder declined. After the owner refused to give the construction jobs to the builder, he sued the owner and the union, alleging a boycott that violated §1 of the Sherman Act. As in the instant case, there was not a complete refusal by the owner to deal with the builder. Indeed, if he had agreed to use union labor, he would gotten the jobs. Nonetheless, the Third Circuit upheld his cause of action. The court also discussed why a jury could find the combination of the owner and the union was an unlawful restraint of trade and stated:

> As in *Connell*, the jury could have found that the defendants entered into an agreement not to deal with nonunion contractors, which operated as a direct restraint on the business market by making those contractors "ineligible to compete for a portion of the available work." The plaintiff introduced evidence that this agreement had "substantial (actual) anticompetitive effects" an

> increase of more than $ 250,000 in the total price paid for the
> twelve restaurants   built by union contractors. Finally, the jury
> could have found that the agreement between Silver's and the
> Councils had "a potential for restraining competition in the
> business market in ways that would not follow naturally from
> elimination of competition over wages and working conditions."
> For, on plaintiff's evidence, that agreement "indiscriminately
> excluded nonunion (contractors) from a portion of the market, even
> if their competitive advantages were not derived from substandard
> wages and working conditions but rather from more efficient
> operating methods." (Citations omitted)

(*Id.* at, 1374)

The negative effects on competition resulting from the deal the defendants made include

the following.  If SMG, upon terminating its relationship as the employer of the Carpenters had

allowed the Show Contractors to use whatever source of labor they wanted, the Carpenter Union

would have to compete on price against the Painter's Union and the Stage Hands.  However,

SMG created an artificial monopoly for the Carpenter Union and leverage that made the Show

Contractor use them. This artificially raised the prices paid by the Show Contractor throughout

the seven counties since the prices were fixed at the Carpenter Union rate –which exceeded the

rates charged by competing unions. In addition, this had the effect of causing an increase in the

prices the Show Contractors charged to their customers; and the exhibitors got hit twice: they

had to deal with increased prices for booth space charged by the Show Producers who would

pass on the higher labor costs they paid, and the exhibitors would likewise face higher charges

from the Show Contractors for the services that the Show Contractors billed them directly.

These price increases were not for better service but on the contrary, they were the product of

SMG's abuse of its power to coerce compliance with its wishes from the Show Contractors.

Furthermore, there was no place for the regional Show Contractors to go if they did not

like what SMG was doing. As the Perrino Affidavit and Report sets forth, regional Show

Contractors like AES move into and make an investment to service a local market.  The costs of

transportation of equipment and staff to areas beyond that local market make the jobs outside of their local area too unattractive for a regional company to even consider making them a main part of their business. Instead, while they may travel occasionally, the reason for their existence is to serve the local market. In the Atlantic City Geographic Market, SMG controlled all of the large shows. These shows accounted for more than half of AES' profit, and AES was second only to one other Atlantic City based Show Contractor (Vista) in the number of shows it worked at the Atlantic City Convention Center. In fact, in the period January 1, 1996 through September 30, 1998, AES did forty shows in the Atlantic City Convention Center, which amounted to 34.2% of all shows in that period at the Atlantic City Convention Center by all Show Contractors; and in the period October 1, 1998 through September 30, 2001, AES performed 64 shows (which was more than any other Show Contractor) and this amounted to 34.4% of all shows by all Show Contractors.[99]

In addition to higher prices that were not related to quality or service, another anticompetitive effect was that the Show Contractor customers of the labor did not get the labor source of their choice, and had to put up with inefficient workers, unproductive work rules and the inability to develop a permanent crew. This meant that the dent in production was passed on to the Show Producers and the exhibitors. In the case of AES' penalty in the form of the imposition of the 1983 Carpenter Union CBA, the problems with inefficiency were magnified since SMG has admitted in its Motion that using the Carpenter Union under the terms of the 1983 Carpenter Union CBA was bad for business and much too costly when it was the employer. The inefficiency that AES had to endure (coupled with the added costs of the bogus grievances) hurt its own profit, but in some cases, as its owners testified, the costs were passed on to customers. Moreover, the customers themselves suffered from the poor performance of the

---

[99]     Appendix O, Table 1 (which is attached to the report of SMG's Expert, D. Crawford).

mandatory Carpenters and the Carpenter Union's wasteful work rules hindered the exhibitors' ability efforts to participate in the show in an economical way. There was also testimony that this caused some exhibitors to take smaller booth space or to forgo a show where they knew that they would have to use Carpenters. Because there were no benefits to AES or its customers in using the Carpenters under the 1983 Carpenter Union CBA, the result was purely anti-competition.

Another injury to competition is seen in the fact that the Painter's Union, which had a collective bargaining agreement with AES, was arbitrarily deprived of business both at the Atlantic City Convention Center as well as in the seven counties. It was an innocent pawn that SMG elected to sacrifice. By the same token, AES lost a pool of good workers since the work load for Painter's Union show workers dried up, and AES lost the opportunity to provide to its customers the lower prices and superior services the Painter's Union provided when compared to the Carpenter Union.

Accordingly, it is erroneous to state that this is just a labor violation, or that it is about the loss of a single competitor. At the time of the antitrust violations, SMG was not an employer of show labor, and should have had nothing to do with AES' labor relations. Yet. because of the market power SMG wielded, it did not have the right to use it for extortion. While it and the Carpenter Union reaped many benefits from the Carpenter Union's 7 County Lock-up, they obtained those benefits at the expense of: (1) the Show Contractors that signed with the Carpenter Union, and  ended up with the unwanted Carpenters as their labor throughout the seven counties; (2) the other unions that competed for work with the Carpenter Union because they never had a chance to offer better terms than the Carpenter Union, and their fate was decided by SMG and the Carpenter Union; (3) the Show Contractors, Show Producers and

exhibitors who were denied the right to have the labor source of their choice, had higher costs, and had to use the inefficient Carpenters; and (4) AES, which paid more for doing shows at the Atlantic City Convention Center than most of the other Show Contractors, and had to subject its Show Producers and exhibitor customers to the pains of the 1983 Carpenter Union CBA and Carpenters inefficiencies.

Clearly, without the Carpenter Union's 7 County Lock-up, there would be competition amongst the labor sources in all venues based on price, efficient work rules and service, Here SMG wants to be congratulated because it eliminated some of the inefficient work rules that other employers had to face when dealing with the Carpenter Union; but those other employers had the right to make their own choices, and SMG was not authorized nor required under any agreement it had with the Carpenter Union to use its power the way it did.

## III.   Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted,

_____/s/Casey Green_____
GARY GREEN
CASEY GREEN
Attorneys for Plaintiff

DATED:       February 28, 2006