# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **HOWARD CASPER,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| | **NO.  00-3465** |
| **SMG (formerly known as Spectacor Management Group), et al.,** | |
| **Defendants.** | |

## REPLY BRIEF FOR THE DEFENDANTS, SMG AND ROBERT McCLINTOCK, IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

x

James A. Matthews, III (JM 2718)
Jessica L. Pollock (JP 7037)
Kelly A. McGrady (KM 3843)
Fox Rothschild LLP
2000 Market Street, 10th Floor
Philadelphia, PA  19103-3291
215-299-2762/2150 (FAX)

Attorneys for the Defendants,
SMG and Robert McClintock

Of Counsel:

Veronica G. Kayne (VK5963)
Haynes and Boone, LLP
1615 L Street, NW
Washington, DC  20036
(202) 654-4517/4247 (FAX)

# **TABLE OF CONTENTS**

Table of Contents ……………………………………………………………i

Table of Authorities ……………………………………………………..iii

I. Introduction and Summary of Argument ............................................. 1

II. Response to Mr. Casper's Statement of Facts ..................................... 3

    A. What were SMG's Nefarious Plans and Schemes? ................... 4

        1. The Scheme to Get Out of the Labor Business. .............. 4

        2. The Scheme to Steal "Common Shows" from
           the Casinos. ...................................................................... 5

    B. What was the Status of the 1983 Agreement? ........................... 6

    C. What were SMG's "Rights" under the ACCC License
       Agreement? ................................................................................ 7

    D. What are the Facts Concerning the Proposed Relevant
       Markets? ................................................................................ 8

    E. Nobody was Precluded from Working in the ACCC. .............. 9

III. Argument ........................................................... 11

    A. Mr. Casper's Brief Does not Remedy the
       Fatal Flaws in his "Tying Arrangement" Claim. .................... 11

        1. Antitrust Injury. ........................................................... 12

        2. The Relevant Markets. .................................................. 14

        3. SMG's "Participation" in the Tied Market. ................... 16

B.   Mr. Casper Fails as a Matter of Law to Establish any of the  Elements of a Concerted Refusal to Deal or Group Boycott. ........................................................................ 17

1.   There was no "Refusal to Deal" with Anyone. ............. 18

2.   Even Assuming Some Refusal to Deal, Mr. Casper Cannot Prove a Per Se Violation Because the Alleged Refusal to Deal did not Involve Either Direct Competitors or the Denial of Access to Something Essential to Competition. ................................................................ 22

(a)   SMG, AES and the Carpenters are not Direct Competitors in any Market................. 22

(b)   No SMG/Carpenters Agreement Denied Anyone Access to Anything Essential to Competition in any Relevant Market. ............. 25

3.   Mr. Casper's Claim Fails as a Matter of Law Under The Rule of Reason, Because he has Failed to Establish the Relevant Markets and has Failed to Establish any Injury to Competition. ............................ 29

(a)   The Relevant Markets......................................... 29

(b)   Injury to Competition ........................................ 33

IV.   Conclusion          ............................................................................ 37

ii

## TABLE OF AUTHORITIES
### FEDERAL CASES

Action Ambulance Serv., Inc. v. Atlanticare Health Servs., Inc.,
815 F. Supp. 33 (D. Mass. 1993) .............................................................16

Alberta Gas Chem., Ltd. V. E.I. du Pont de Nemours & Co.,
826 F.2d 1235 (3d Cir. 1987), cert. denied, 486 U.S. 1059
(1988) ..........................................................................................................13

Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328
(1990) ..........................................................................................................35

Balaklaw v. Lovell, 14 F.3d 793 (2d Cir. 1994) .........................................13

Bocobo v. Radiology Consultants of S. Jersey, P.A., 305 F.
Supp.2d 422 (D.N.J. 2004)...........................................................13, 33 35

Brown Shoe Co. v. United States, 370 U.S. 294(1962) ..............................35

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477
(1997) ..........................................................................................................35

City of Pittsburgh v. West Penn Power Co., 993 F. Supp. 332
(W.D. Pa.), aff'd, 147 F.3d 256 (3d Cir. 1998).......................................33

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) .......................9

Eastman Kodak Co. v. Image Technical Services, Inc., 504
U.S. 451 (1992) ....................................................................................27, 28

Fishman v. Estate of Wirtz, 807 F.2d (7th Cir. 1986)................17, 25, 32, 33

Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737(3d
Cir. 1996)....................................................................................................25

Jefferson Parish Hosp. v. Hyde, 466 U.S. 2 (1984) ..........................12, 14, 16

Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207
(1959) ..........................................................................................................17

PH1 811806v5 03/27/06

Larry V. Muko, Inc. v. Southwestern Pa. Bldg. & Constr.
    Trades Council, 609 F.2d 1368 (3d Cir. 1979) ......................................20

Larry V. Muko, Inc. v. Southwestern Pa. Bldg. & Constr.
    Trades Council, 670 F.2d 421 (3d Cir. 1982) cert. denied,
    459 U.S. 916 (1982) .............................................................................. 21

Malley-Duff & Assoc. v. Crown Life Ins. Co., 734 F.2d at 140 ...........17, 29

Mathews v. Lancaster Gen. Hosp., 87 F.3d 624 (3d Cir. 1996) ..................33

Northwest Wholesale Stationers, Inc. v. Pacific Stationery &
    Printing Co., 472 U.S. 284 (1985) ...............................22,24,25,26, 27, 28

Otter Tail Power Co. v. United States, 410 U.S. 366 (1973).......................25

Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430
    (3d Cir. 1997), cert. denied, 523 U.S. 1059 (1998) .......................12,14,31

Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715 (3d Cir.
    1991), cert. denied, 505 U.S. 1221 (1992)........................................32, 33

Urdinaran v. Aarons, 115 F. Supp.2d 484 (D.N.J. 2000)............................32

## FEDERAL STATUTE

15 U.S.C. § 1 .............................................................................................21,22

## SECONDARY SOURCE

J. von Kalinowski, P. Sullivan & M. McGuirl, Antitrust Laws and
    Trade Regulation (2d ed. 2005) ………………………17,22,25

iv

# I.  INTRODUCTION
## AND SUMMARY OF ARGUMENT

Now having the benefit of Mr. Casper's brief, where are we with his case?  At best, we are in the far reaches of legal insufficiency, hard against the border with frivolousness.  At worst, we have left frivolousness behind and we are squarely in the realm of objective bad faith.

SMG's[1] brief, and accompanying Statement of Undisputed Material Facts, identified the material facts.  Mr. Casper did not respond to that Statement nor does his brief identify which, if any, of these facts he disputes.  His only reference to SMG's factual discussion was to characterize it as "very truncated and self-serving" (Casper Br. at 2).  If "truncated" means that, in contrast to his own brief, SMG included only those facts material to the issues raised by the motion and did not engage in a wandering, pointless narrative of immaterial facts, we agree.  If "self-serving" means that the material facts SMG presented compel the entry of summary judgment in its favor, we also agree.  Beyond that, Mr. Casper simply weaves his own hyperbolic tale (some of which is undisputed, some of which is disputed

---

[1] Once again, SMG and Mr. McClintock will be referred to jointly as "SMG" and both once again consent to the Carpenters' reliance on their arguments.  SMG will also continue to use the "short form" references as defined in its principal brief without re-defining them the first time they are used here.

only in characterization and some of which is hotly disputed), often going on for paragraphs without meaningful citation to the record.[2]  Nor, for the most part, does he tell us why any of his "facts," much less any of his abundant supply of colorful adjectives and adverbs, are, even if disputed, material to the issues raised by SMG's motion.

SMG's brief then turned to the theory of liability set forth in the Complaint[3] and to the "tying arrangement" theory, not pled in the Complaint, first articulated by Mr. Casper during discovery.  His brief fails even to address any of SMG's arguments or authorities on either theory and he actually appears to have abandoned the former.  His decision simply to ignore SMG's arguments pushes the boundaries of good faith in opposing the motion.  Beyond that, what argument and authority Mr. Casper does provide does nothing to demonstrate that AES suffered any cognizable

---

[2] This dearth of citations to record support for his factual discussion is all the more peculiar given that Mr. Casper has burdened the Court and the parties with a 15 volume, 3,524 page "Appendix" and then cites specifically to only 223 of those pages.  At the same time, Mr. Casper attempts, "in light of the page limitation allowed by the Court," simply to "incorporate by reference" in his factual discussion entire portions of this "Appendix" without specific citation (Casper Br. at 2).  Of course, he is no more permitted to do that than he is permitted to ignore, as he has, the type size requirements of Local Rule 7.2(d) in order to cram more material into the pages allowed.

[3] Once again, the sole theory of the Complaint is that the Subcontracting Agreement "unreasonably restrains trade and commerce in the business of providing general services to trade shows in the Atlantic City area" (Complaint ¶ 29).

antitrust injury (so that it, and therefore he, would have antitrust standing) or to establish the proposed relevant markets with competent evidence.

The one aspect of Mr. Casper's opposition that SMG's brief did not anticipate is his "concerted refusal to deal/group boycott" theory. This theory too goes far beyond anything alleged in the Complaint, and the Court may decline to consider it for that reason. Should the Court excuse this procedural defalcation, it will be considering the *piece de resistance* of Mr. Casper's campaign to establish wholly unrecognizable theories of antitrust liability by mixing and matching allegedly relevant markets and indiscriminately using elements of antitrust vocabulary as talismans, without regard for substantive antitrust law. Simply put, he fails as a matter of law to demonstrate the existence of any of the elements of his claim.

The time has come to end this.

SMG is entitled to Summary Judgment.

## II.  RESPONSE TO MR. CASPER'S STATEMENT OF FACTS

We are not here on a Motion to Dismiss. We are here on a Motion for Summary Judgment. The time for allegations is past and the time for evidence is here. Mr. Casper's Statement of Facts provides none and requires only brief response. To impose some structure on an otherwise

3

unstructured narrative, SMG will group by subject matter areas requiring some response, even if they appear in different places in Mr. Casper's brief.

A.    What were SMG's Nefarious Plans and Schemes?

1.    The Scheme to Get Out of the Labor Business.

Mr. Casper engages in an extensive discussion of what he characterizes as SMG's "schemes" (Casper Br. at 8-13 & 25-26). Stripped of the adjectives and invective, Mr. Casper posits that SMG wanted to get the ACCC out of the business of employing show labor itself and to improve the terms on which such labor was provided, while (a) protecting the Carpenters' right to perform those aspects of show work they had always performed and (b) avoiding labor disputes that would disrupt either the construction or operation of the new West Hall. He then goes on to allege that the challenged Subcontracting and Seven County Agreements were the means chosen to accomplish that goal.

While Mr. Casper provided little in the way of citations to the record in support of this discussion, the fact is that he's absolutely right. That's exactly what SMG tried to do. There's never been any secret about that and it's hard to imagine anything wrong with either the goal or the motive. The question is whether the chosen means violated the Sherman Act.

4

SMG's motion asserts that, as a matter of law, they did not and turns on four legal questions: antitrust injury to AES, proper definition of the relevant product and geographic markets and, in light of the newly-concocted group boycott claim, whether any AES competitor agreed with some other entity to exclude AES or anyone else from a relevant market in which the two competed or sought to compete. Nothing in Mr. Casper's extended discussion of SMG's alleged "schemes" has anything to do with those issues and, in fact, he never really tries to argue that it does. Therefore, the discussion is completely immaterial to this motion.

    2.    <u>The Scheme to Steal "Common Shows" from the Casinos.</u>

Mr. Casper also describes a subsidiary "scheme." According to him, SMG wanted to increase show labor costs in the casino hotels by mandating the use of Carpenters by Service Contractors signatory to the Seven County Agreement, thereby making the ACCC more competitive with the casinos for the "Common Shows" (Casper Br. at 10-11& 27-29).

This is pure fantasy completely unsupported by the record, but, again, it has nothing to do with the existence of a cognizable antitrust injury <u>to AES</u>, the proper definition of the relevant markets (indeed, the whole scenario depends on the existence of relevant markets he never proves) or

5

the elements of the group boycott claim.  Thus, even if there are factual

disputes, they are not material to this motion.[4]

B.      What was the Status of the 1983 Agreement?

Mr. Casper contends that, at least by the time the Seven County

Agreement was implemented, the 1983 Agreement had expired, been

revoked or superseded, or had otherwise become ineffective (Casper Br. at

8-9, 15-16 & 19-24).  The facts surrounding this question are, at best,

confusing and, at worst, hopelessly disputed.

As discussed below, Mr. Casper refers continually to these facts in

arguing about whether or not something SMG did was either "required" or

"allowed" by a collective bargaining agreement with the Carpenters.  While

those questions may be relevant to the applicability of the Non-Statutory

Labor Exemption  -- an issue SMG elected not to raise in this motion

precisely because the facts are confusing – they are not material to the

presence or absence of an antitrust injury to AES, the proper definition of

the relevant markets or any element of a concerted refusal to deal.

---

[4] Mr. Casper also alleges, principally in a footnote, that SMG engaged in
various forms of "harassment" in an effort to force AES to sign the Seven
County Agreement (Casper Br. at 13 & n.26).  These allegations are hotly
disputed.  However, they are also immaterial to any of the issues raised by
the Motion and, at least as SMG reads his brief, Mr. Casper nowhere tells us
how he thinks they are material to those issues.

6

Thus, none of this discussion is material to this motion and, therefore, any disputes of fact it contains do not preclude the entry of summary judgment.

C.    What were SMG's "Rights" under the ACCC License Agreement?

In much the same way, Mr. Casper devotes significant "factual" discussion to what he sees as the differences between the ACCCA's ability to dictate labor terms to Show Producers under the "Lease Agreement" it used and SMG's ability to do so under the "License Agreement" it used (Casper Br. at 4 & n.10; 16-17 & nn.38-40).  Whether or not these are distinctions with a difference,[5] Mr. Casper nowhere explains how SMG's contractual rights vis-à-vis the Show Producers – under contracts to which AES and the other Service Contractors were complete strangers – have anything to do with the presence of an antitrust injury suffered by AES, the

---

[5] They are not.  It is undisputed that the SMG license required Show Producers to comply with all building policies, specifically including labor policies, and that it was upon this basis that SMG required Show Producers to require that their Service Contractors use Carpenters to perform Carpenters Show Work (NLRB Tr. at 111 (McClintock)(CA v.J).  In this brief, SMG refers to some excerpts of the NLRB or deposition testimony not included in its Certification of Counsel.  Since Mr. Casper's "Appendix" contains the entire transcript of the NLRB hearing as well as every deposition in this case, SMG will not burden the Court with a supplemental certification, but will indicate the volume of the Casper Appendix ("CA") where the passage can be found.

proper definition of the relevant markets or the elements of a concerted refusal to deal.

Thus, this entire discussion as well is completely immaterial to the issues presented on this Motion and any disputes of fact contained in it do not preclude the entry of summary judgment.

D.    <u>What are the Facts Concerning the Proposed Relevant Markets</u>?

Mr. Casper offers only one, telling us that "the Atlantic City Convention Center is the only venue in the entire South Jersey shore area ("Atlantic City Geographic Market") where trade shows that required more than 10,000 square feet could be held ("Convention Center Only Shows")" (Casper Br. at 4). This fact is undisputed.

It might even be material, <u>if</u> Mr. Casper had provided any other admissible facts sufficient to establish that these are relevant geographic and product markets for antitrust purposes (and, perhaps, explained why and how he so contends when AES long ago disclaimed the relevance of any ACCC-only geographic market (SMG Br. at 34-35 & n.21)). But he hasn't. As discussed below in the course of argument, while he <u>talks</u> about a number of alleged geographic and product markets, that's all he does. He does not provide a single piece of empirical evidence which would permit him to establish the <u>any</u> of his allegedly relevant markets under the standards

8

of cross-elasticity of supply and demand required by the cases he fails even to mention.[6]

Nothing in this discussion precludes the entry of summary judgment.

E.      Nobody was Precluded from Working in the ACCC.

Mr. Casper states several times and in several different ways that Service Contractors, including AES, were not permitted to work in the ACCC unless they signed the Seven County Agreement and/or that contractors, the Painters Union and others were barred from the building (See, e.g., Casper Br. at 10 & 14).  He provides no evidentiary support for those statements.  That's because there is none.

---

[6] While one can never be entirely sure what Mr. Casper is doing, it may be that this is the purpose of his attempt to "incorporate by reference" "the complete Affidavit and Report of Patrick Perrino" and "the expert report of Professor Philip L. Harvey" (Casper Br. at 2).  Aside from all the reasons why this is procedurally improper, Dr. Harvey offers no opinion on the proper definition of the relevant markets and admits that he has no facts which would permit him to do so (Harvey Dep. Tr. at 80-81 & 145-46; SMG Br. at 22-23 & n.15; 37-39 & n.23).  While Mr. Perrino asserts any number of facts and offers multiple conclusions, he too admits that he performed no market analysis and possesses no empirical evidence in support of his market opinions (Perrino Dep. Tr. at II:71; SMG Br. at 22-23 & n.15; 37-39 & n.23).  Mr. Casper failed to address any of these issues in his brief and, further, offers nothing that would establish Mr. Perrino as an expert in anything or to qualify any of his opinions as admissible under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), and its progeny.

It is undisputed that all SMG required was that Service Contractors use Carpenters for those specific tasks which constituted Carpenters Show Work, leaving them free to use whatever labor they wished for the remainder of the show work (Casper Dep. Tr. at 88 & 172-73; SMG Br. at 7-8 & n.7). It is equally undisputed, that no Service Contractor was required to sign the Seven County Agreement in order to work in the ACCC, because SMG continued to make its own Carpenters employees available under the same terms as in the past (Casper Dep. Tr. at 50-51; Perrino Dep. Tr. at I:51).[7] As discussed below, and as he admits elsewhere in his factual discussion, Mr. Casper's real complaint is that AES could not obtain Carpenters labor to perform Carpenters Show Work under the more favorable terms of the Seven County Agreement without signing it (Casper Br. at 13).[8]

---

[7] Because of this, and because of the absence of any <u>evidence</u> (as distinct from <u>allegations</u> ) that the Carpenters' policies in regard to the scope of, and who would be permitted to sign, the Seven County Agreement were the result of any agreement with SMG, Mr. Casper's extended discussion of them (Casper Br. at 13-15) is immaterial to any of the issues raised by this motion.

[8] Mr. Casper also alleges, again without citation to the record, that SMG did not cease enforcing the Subcontracting Agreement until after the Third Circuit's February 2003 decision in the NLRB Case (Casper Br. at 1). This contradicts both his prior Interrogatory Answers and deposition testimony agreeing that SMG actually ceased enforcing the agreement and began to permit Service Contractors to use whatever labor they chose after the NLRB's September 2001 decision (Plaintiff's Answer to Interrogatory No. 7 of SMG's First Set of Interrogatories and Interrogatory No. 2 of Local

10

## III. ARGUMENT

Mr. Casper is now proceeding solely on two theories – tying and concerted refusal to deal -- found nowhere in the Complaint.  As SMG pointed out in its principal brief, this alone entitles it to summary judgment (SMG Br. at 25, n.17 (citing cases)).[9]

Assuming that the Court wishes to reach the substance of Mr. Casper's newly-concocted claims, it remains clear that each fails as a matter of law.

### A.     Mr. Casper's Brief Does not Remedy the Fatal Flaws in his "Tying Arrangement" Claim.

SMG has pointed out four fundamental flaws in Mr. Casper's "tying arrangement" claim.  First, he has not shown that AES suffered an antitrust injury, a prerequisite to standing.  Second, he has not offered any competent evidence in support of his proposed relevant geographic markets.  Third, he has he has not offered any competent evidence in support of his proposed relevant product markets.  Fourth, he has not offered any evidence that SMG

---

623's First Set of Interrogatories (Exhibit "H" to SMG's Certification of Counsel); Casper Dep. Tr. at 213-14 (CA v.C)).  Thus, the alleged "Liability Period" (Casper Br. at 1), if there is one,  actually runs from approximately October 1, 1998 through approximately September 30, 2001.

[9] While it is difficult to comprehend why, Mr. Casper has not even sought leave to amend the Complaint to conform to his arguments after this defect was pointed out to him by SMG's brief.

had a direct economic interest in the alleged "tied" product.  His brief does nothing to remedy these flaws.

1.      Antitrust Injury.

As SMG has explained, tying law seeks to protect competition in the tied market, where purchasers of the tied product (who were forced to purchase a product they didn't want) and competing suppliers of the tied product (who had sales foreclosed) suffer antitrust injury and have standing to challenge the "tie" (SMG Br. at 27-30 (citing inter alia Jefferson Parish Hosp. v. Hyde, 466 U.S. 2, 12 & 26-29 (1984); Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.2d 430, 442-43 (3d Cir. 1997), cert. denied, 523 U.S. 1059 (1998)).  Mr. Casper apparently agrees (Casper Br. at 29 (citing other cases)).  He also concedes that AES was not an actual purchaser of Carpenters labor outside the ACCC (his alleged "tied product") and never signed the Seven County Agreement which would have forced it to do so (Casper Dep. Tr. at 51; Perrino Dep. Tr. at I:42 & 47; II:95 (CA v.G)).  He never argues that AES was a competing supplier of the "tied" product, nor does he ever contradict his own "expert," who concedes that AES suffered no injury in the "tied" market (Harvey Dep. Tr. at 228).  So what does he argue?

12

He argues two things.  First, he argues that others – like his competitors who did sign, the casino hotels themselves and the Painters Union  – could have suffered harm in the "<u>tied</u>" market (even though they apparently don't think so or have chosen not to complain) (Casper Br. at 33-35).  Even if true (something SMG certainly doesn't concede), AES (and, therefore, Mr. Casper) can't rely on an antitrust injury to someone else to establish their own antitrust standing.  "Proving an antitrust injury for purposes of standing is a separate inquiry from whether there has been a substantive antitrust violation."  <u>Bocobo v. Radiology Consultants of S. Jersey, P.A.</u>, 305 F. Supp.2d 422, 425 (D.N.J. 2004)(Irenas, J.)(citing <u>inter alia</u>, <u>Balaklaw v. Lovell</u>, 14 F.3d 793, 800 (2d Cir. 1994); <u>Alberta Gas Chem., Ltd. v. E.I. du Pont de Nemours & Co.</u>, 826 F.2d 1235, 1240 (3d Cir. 1987), <u>cert. denied</u>, 486 U.S. 1059 (1988))(other citations omitted).

Second, Mr. Casper argues that AES was injured in the "<u>tying</u>" market, because it couldn't get the more favorable terms of the Seven County Agreement without signing it and had to obtain Carpenters labor through SMG on less-favorable terms (Casper Br. at 31-32).  Perhaps so, but that's still not an injury in the "tied" market and, therefore, is not an <u>antitrust</u> injury cognizable under a tying arrangement theory.  <u>Jefferson Parish Hosp.</u>, 466 U.S. at 12 & 26-29; <u>Queen City Pizza</u>, 124 F.2d at 442-43.  As in so

13

many other areas, Mr. Casper simply ignores the cases and offers no authority of his own for the proposition that harm suffered only in the "tying" market can confer antitrust standing on a tying arrangement theory.

2.      The Relevant Markets.

Ever since taking over this case from AES and abandoning AES' relevant market theories (SMG Br. at 33-35 & n.21), the lynchpin of Mr. Casper's case has been that the ACCC, standing alone, is a relevant geographic market for "large trade shows." Even ignoring all his other problems, if he can't establish that, his tying theory collapses. SMG has demonstrated, in detail and with specific citation to the record and the law, why Mr. Casper had failed to establish such a market definition (SMG Br. at 37-42). In his three and one-half page discussion of the allegedly relevant markets, Mr. Casper doesn't even acknowledge, much less overcome, any of SMG's arguments and authorities. Indeed, he fails to cite a single piece of evidence or legal authority in support of his own position (Casper Br. at 30-33). There is nothing more for SMG to say on this point.

Much the same is true of Mr. Casper's alleged product markets. His principal theory is that the "tying product would be Carpenter labor at the [ACCC] at the same price, and with the same work rules" as under the Seven County Agreement and that the "tied" product is Carpenters labor outside

14

the ACCC (Casper Br. at 31).[10]  SMG has explained why, as a matter of law, these alleged markets are not relevant for antitrust purposes (SMG Br. at 43-44 (citing cases)).  Again, Mr. Casper ignores the issue, fails to discuss or distinguish the cases and points to nothing other than anecdotes and assumptions to support his theory.

Without competent evidence that conforms to antitrust principles of market definition, Mr. Casper still fails as a matter of law to establish his proposed relevant markets.

---

[10] While this becomes a little hard to follow, Mr. Casper offers an alternative version of the alleged tying arrangement, in which "the tying product would be gaining access to perform services for a Show Producer with a License to hold a show at the [ACCC]" and the "tied" product would be Carpenters labor (Casper Br. at 31 & nn. 88-89).  Apparently recognizing that this formulation makes absolutely no sense as stated, Mr. Casper explains that "[w]hile this sounds like a tautology it is because then the case would be transformed into a naked refusal to deal" (Casper Br. at 31 n.88).  Candidly, that does not sound at all like a tautology.  It sounds like gibberish.  In any event, however, it is not a "tying arrangement" that the Court need consider.

3.     SMG's "Participation" in the Tied Market.

Whether he is playing semantic games or simply misses the point, Mr. Casper's suggestion that a defendant can be liable on a tying claim even if it is not a participant in the "tied" product market (Casper Br. at 35-37) is simply wrong.

SMG has never argued that the seller of the "tying" product must also be the seller of the "tied" product.  What SMG has said is that the seller of the "tying" product must have a direct economic interest in the "tied" product (SMG Br. at 45 (citing cases)).  While it may be the most common way, being the seller is only one way to have a direct economic interest in the "tied" product.  Another is to receive payment from the seller of the "tied" product based on those sales and those were exactly the facts of the two cases cited by Mr. Casper.  Jefferson Parish Hosp., 466 U.S. at 6, n.4 (hospital did not sell the tied product – anesthesiology services – but it did split the profits from those sales with the exclusive provider); Action Ambulance Serv., Inc. v. Atlanticare Health Servs., Inc., 815 F. Supp. 33, 34 (D. Mass. 1993)(hospital did not sell ambulance services, but shared in the profits of the exclusive provider).

There is no allegation, much less any evidence, that SMG received any sort of payment from the Carpenters when its members were employed

in the casino hotels, so that, even accepting Mr. Casper's market definitions, his tying arrangement claim still fails.

**B.    Mr. Casper Fails as a Matter of Law to Establish any of the Elements of a Concerted Refusal to Deal or Group Boycott.**

As explained by the very decision upon which Mr. Casper places principal reliance, "[a] group boycott occurs when the plaintiff's <u>competitors</u> are in a position to deal with the plaintiff but agree not to." <u>Fishman v. Estate of Wirtz</u>, 807 F.2d 520, 543 (7th Cir. 1986)(emphasis added) (citing <u>inter</u> <u>alia</u>  <u>Klor's, Inc. v. Broadway-Hale Stores, Inc.</u>, 359 U.S. 207 (1959)). For such a boycott to have antitrust significance, it must exclude the victim from, or place it at a competitive disadvantage in, a relevant market, to the advantage of a competitor participating in the boycott,  <u>Malley-Duff & Assoc. v. Crown Life Ins. Co.</u>, 734 F.2d 133, 140 (3d Cir.), <u>cert. denied</u>, 469 U.S. 1072 (1984).  <u>See also</u> 1 J. von Kalinowski, P. Sullivan & M. McGuirl, <u>Antitrust Laws and Trade Regulation</u> § 12.02[2][d] (2d ed. 2005)("<u>von Kalinowski</u>").

Mr. Casper tells us that the "illegal boycott" took place "[w]hen SMG made a deal with the Carpenter Union that it would not allow AES to use Painter's Union workers in the [ACCC]" (Casper Br. at 37).  That much is clear.  However, not much else about his argument is at all clear.  As was the

17

case with much of his factual discussion, Mr. Casper's argument is such a muddle of twisted concepts and inconsistent arguments that parsing how he turns this so-called "deal" into an illegal boycott is like trying to grasp smoke. The only way to frame any coherent response, therefore, is to ignore the structure of Mr. Casper's argument and simply analyze each of the elements of a refusal to deal.

1.    <u>There was no "Refusal to Deal" with Anyone.</u>

While he flits back-and-forth among them, Mr. Casper suggests three possible "refusals to deal." First, that SMG agreed with the Carpenters that it would not "deal" with the Painters Union (Casper Br. at 39). Second, that SMG agreed with the Carpenters that SMG would not "deal" with AES (Casper Br. at 37 & 39). Third (although this is much more implicit than explicit in the argument), that SMG agreed with the Carpenters that the Carpenters would not "deal" with AES. The undisputed material facts fail to support any of these allegations and, in fact, establish the contrary.

SMG never "refused to deal" with the Painters Union, in the sense of denying its members the ability to perform show work in the ACCC. Messrs. Casper and Perrino concede that AES and the other Service Contractors were always permitted to employ Painters to perform show work, except for those specific tasks which constituted the traditional

18

Carpenters Show Work (Casper Dep. Tr. at 53, 88 & 172-73; Perrino Dep. Tr. at I:51).  Similarly, SMG never "refused to deal" with AES, in the sense of denying it the ability to work in the ACCC.  Messrs. Casper and Perrino also concede that AES was always able to work in the ACCC, so long as it complied with the established labor policies.  Indeed, even though SMG wanted to end its role as a "middleman" for Carpenters labor (something on which SMG and AES agree), it continued to make its Carpenters employees available to AES, on the same terms it always had, in order to permit AES to comply with established labor policies without having its own agreement with the Carpenters (Casper Dep. Tr. at 50-51; Perrino Dep. Tr. at I:51). Finally, it is undisputed that the Carpenters offered to "deal" with AES on the same terms that it was dealing with all of AES's competitors and that it was AES that elected not to deal with the Carpenters on those terms (Casper Dep. Tr. at 46-47, 113-15 (CA v.C); Perrino Dep. Tr. at I:91-92; 95 (CA v.G)).  So where's the refusal to deal?

While one must drill down pretty far into the rhetoric to grasp it, Mr. Casper argues that SMG's requirement that AES use Carpenters to perform Carpenters Show Work in the ACCC is the same as refusing to permit it to

work in the ACCC at all (Casper Br. at 42).[11]  Stated more generally, he

suggests that proposing the terms on which one entity will deal with another

is the legal equivalent of refusing to deal at all.

Mr. Casper's sole authority for this "conditioned dealing equals

refusal to deal" argument is an egregious reading of Larry V. Muko, Inc. v.

Southwestern Pa. Bldg. & Constr. Trades Council, 609 F.2d 1368 (3d Cir.

1979) (en banc)("Muko I") (Casper Br. at 42).  Muko was a non-union

contractor who claimed that the Long John Silver's restaurant chain agreed

with various unions not to hire any non-union building contractors and

argued that this agreement violated the Sherman Act because it excluded an

entire class of competitors from the market.  609 F.2d at 1370-72.  The

District Court granted a directed verdict for the defendants, finding that there

was insufficient evidence of an actual agreement.  The Third Circuit

reversed, finding that the question of the existence of an actual agreement

should have gone to the jury.  Id.  That is all the Third Circuit held in Muko

I.  The Court then remanded the case for trial on (a) the existence of an

agreement, (b) the proper definition of the relevant markets and (c) the

presence of sufficient anti-competitive effect in such a market.  Id.  After a

defense verdict on remand, the Third Circuit held that, even though the

---

[11]All of this assumes, of course, proof that the ACCC is a relevant market,
something which is, as discussed below, entirely lacking.

challenged agreement excluded <u>an entire class of competitors</u>, it did not

violate the Sherman Act, either under the per se rule or the rule of reason.

<u>Larry V. Muko, Inc. v. Southwestern Pa. Bldg. & Constr. Trades Council</u>,

670 F.2d 421 (3d Cir. 1982)("<u>Muko II</u>"), <u>cert. denied</u>, 459 U.S. 916 (1982).

Of course, Mr. Casper fails even to mention <u>Muko II</u>, much less to point to

anything in either decision which actually supports his argument.[12]

Thus, Mr. Casper fails as a matter of law to prove any refusal to deal,

much less an unlawful one.

---

[12] Moving from the general to the specific, the reason Mr. Casper gives us for why this, particular "condition" to SMG's willingness to deal – the insistence that Carpenters Show Work be done by Carpenters – was unlawful once again demonstrates that this case is really about labor law and not about antitrust law.  Mr. Casper argues that, once SMG gave up the exclusive right to perform Carpenters Show Work with its own employees, it "had no right to insinuate itself into the business of the Show Contractor" (Casper Br. at 41) and "should have had nothing to do with AES' labor relations" (<u>Id.</u> at 45).  He's half right.  It is true that, once it gave up the exclusive right to perform this work, SMG was legally precluded from agreeing with the Carpenters – but not from requiring unilaterally – that Service Contractors use Carpenters for Carpenters Show Work.  That agreement, however, is prohibited by Section 8(e) of the Labor Act, not by anything in the Sherman Act, and demonstrates once again that this is not an antitrust case at all (<u>See</u> SMG Br. at 20-21 & n.14).

2.      Even Assuming Some Refusal to Deal, Mr. Casper
        Cannot Prove a Per Se Violation Because the Alleged
        Refusal to Deal did not Involve Either Direct Competitors
        <u>or the Denial of Access to Something Essential to Competition.</u>

Mr. Casper argues that the per se rule applies to any refusal to deal

which has "predominantly anticompetitive effects" and that this is such a

case  (Casper Br. at 40 & n. 97 (citing <u>Northwest Wholesale,</u> 472 U.S. at

298)).  He once again totally perverts the legal principles on which he relies.

The per se rule applies only where the "boycott" involves direct

competitors and denies one competitor access to something essential to

competition in the market where they are all competing.  <u>Northwest</u>

<u>Wholesale,</u> 472 U.S. at 293-97; Von <u>Kalinowski</u> at § 12.02[2].  Mr. Casper

can establish neither.

(a)     SMG, AES and the Carpenters are
        <u>not Direct Competitors in any Market</u>

According to Mr. Casper, there were two parties to the alleged group

boycott:  SMG and the Carpenters.  That being the case, who was the

competitor of either of them that the boycott sought to exclude from a

relevant market in which the two participated?  Mr. Casper attempts two

answers to this question.

First, he argues that AES, the Carpenters and SMG are all competitors

in the market of "selling Carpenters labor" because a Show Producer could

22

"purchase Carpenters labor" directly from the Carpenters or through a "middleman," such as a Service Contractor or SMG itself (Casper Br. at 39). But, despite Mr. Casper's repeated suggestions to the contrary, and even assuming that such a market is relevant, AES doesn't compete in the market of selling (or re-selling) labor itself.  Rather, by his own description, AES and other Service Contractors purchase a variety of inputs (including Carpenters labor and the labor of others (SMG Br. at 7-8 & n.7)), bundle them together and turn them into a package of services provided to Show Producers and Exhibitors (Casper Br. at 1 & n.1).[13]  Put more practically, the Show Producer and Exhibitors are paying AES to install and dismantle the show in the same way that the GSA paid its contractor to build a new Camden courthouse.  The Show Producers aren't simply buying raw show labor from AES anymore than the GSA was simply buying raw construction labor (or, for that matter, steel, concrete, doors and windows).  Conversely,

---

[13]At the very outset of his brief, Mr. Casper describes AES as a company that

> operates a business that provides decorating services for trade shows and other public gatherings  .  .  .  consisting of the set-up and take-down of exhibits, as well as providing planning and furnishings.

(Casper Br. at 1).  He then goes on to adopt that description of AES's business as the very definition of what a Service Contractor does (Id. at 1, n.1).

23

if, as and when a Show Producer or Exhibitor actually does "purchase" raw labor directly, it is acting as its own Service Contractor.  It may be purchasing the same raw material that AES purchases, but it is getting none of the services AES provides (nor, for that matter, any value from the other raw materials that AES also buys, such as the labor of other unions or show booth furnishings).  Clearly, then, this argument fails to establish that either SMG or the Carpenters is a competitor of AES.

Mr. Casper's alternative argument is that the "real target" of both the "boycott and tying violations" was the Painters Union, which the Carpenters allegedly wanted to exclude from competing with them to perform Carpenters Show Work in the ACCC.[14]  As discussed above, Mr. Casper then asserts that AES' preference for using Painters labor to perform Carpenters Show Work in the ACCC, makes AES a "proxy" for the Painters Union, thus bringing the case "neatly within the holding of" Northwest Wholesale Stationers (Casper Br. at 39).  As discussed elsewhere, this case

_____

[14] In this regard, it bears repetition that Mr. Casper misstates the facts when he alleges that "the Carpenter Union was fighting against the Painter's Union being able to break into" the ACCC (Casper Br. at 39).  It is undisputed that the Painters always worked in the ACCC and that nothing in any SMG/Carpenters agreement excluded them or anyone else from doing so.  All the agreement did was prevent Service Contractors from assigning the specific tasks traditionally performed by the Carpenters to others (SMG Br. at 7-8 & n.7).

bears no resemblance at all to <u>Northwest Wholesale Stationers</u>.  Even if it

did, nothing in <u>Northwest Wholesale Stationers</u> supports this "proxy" theory.

     (b)    No SMG/Carpenters Agreement Denied
                 Anyone Access to an Anything Essential
                 <u>to Competition in any Relevant Market.</u>

Mr. Casper yet again conflates two, distinct antitrust concepts.  The

first, the so-called "essential facility doctrine," is a distinct sort of refusal to

deal by a monopolist in one market with one of its own competitors in

another market.  <u>See, e.g.</u>, <u>Otter Tail Power Co. v. United States</u>, 410 U.S.

366, 377 (1973); <u>Ideal Dairy Farms, Inc. v. John Labatt, Ltd.</u>, 90 F.3d 737,

748 (3d Cir. 1996). <u>See generally</u> 2 <u>von Kalinowski</u> § 25.04[3][b] & nn.

112-15.  It has nothing to do with Mr. Casper's efforts to establish a "per se"

unlawful refusal to deal.[15]

---

[15]As the Third Circuit explained in <u>Ideal Dairy</u>, the "necessary elements" of
an essential facility claim are:

> (1) control of the essential facility by a monopolist;
> (2) the competitor's inability practicably or
> reasonably to duplicate the essential facility; (3)
> denial of the use of the facility to a competitor; and
> (4) the feasibility of providing the facility.

90 F.3d at 748 (citations omitted)(emphasis added).  For example, the parties
in <u>Wirtz</u> were competing to buy the Chicago Bulls basketball team.  One of
them also controlled the Chicago Stadium, the only indoor venue in the
market suitable for NBA games.  <u>Id.</u> at 539-40.  The Seventh Circuit found
the Chicago Stadium (which was in the "upstream" market of provding

The second concept involves "joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'" Northwest Wholesale Stationers, 472 U.S. at 294 (quoting L. Sullivan, Law of Antitrust 261-62 (1977). In that case, the plaintiff alleged that access to the wholesale buying cooperative was essential to effective competition in the retail stationery market in which it and the other members of the cooperative competed with each other. In agreeing with the District Court that Pacific Stationery had not made out a cognizable per se claim, the Supreme Court explained:

> A Plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominately anticompetitive effects. The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal

---

venue space for athletics and other productions) to be an "essential facility" for competition in the "downstream" market of presenting professional basketball in Chicago and that the party controlling it violated the Sherman Act in refusing to lease it to the other in order to improve its own position in the competition to buy the Bulls. Id. at 539-41. Here, even assuming that SMG (or the Carpenters) is a monopolist in some relevant "upstream" market related to the ACCC, there is no "downstream" market in which either competes or seeks to compete with AES, including the purported market of "providing general services to trade shows in the Atlantic City area" to which Mr. Casper refers (Casper Br. at 37 & 43-44). Thus, the "essential facility" doctrine simply doesn't apply and to suggest that it does represents either a breathtaking failure to understand basic antitrust doctrine or an intentional misuse of it.

> are predominately anticompetitive.  When the
> plaintiff challenges expulsion from a joint buying
> cooperative, some showing must be made that the
> cooperative possesses market power or unique
> access to a business element necessary for
> effective competition.

Id. at 298.

Again, it is difficult to parse Mr. Casper's argument here in terms that make any sense at all, but, if we take him at his word that he thinks that this case "fits neatly within the holding of Northwest Wholesale Stationers" (Casper Br. at 39), then he must be attempting to analogize the ability to work in the ACCC to membership in the Northwest wholesale buying cooperative and to analogize the Atlantic City-area trade show service contractor market to the retail stationery market.  Having thus structured the analogy, he argues that, for what he describes as a "Local" Service Contractor, working in the ACCC is essential to competing in Atlantic City because AES "could not survive on a diet of small shows" outside the ACCC and could not afford, because of the extent of its investment in local infrastructure, to work in an expanded, or different, geographic market (Casper Br. at 37 & 43-44).[16]

---

[16]As discussed above, Mr. Casper either completely misapprehends, or intentionally misuses, the "essential facility" doctrine.  The same is true of his argument that its substantial investment in Atlantic City area facilities supposedly had AES "locked into" working in Atlantic City even "if they

27

The substantive problems with this theory are legion,[17] but the

fundamental flaw is, once again, that AES was never denied the ability to

work in the ACCC under the same terms as its competitors.  To the contrary,

Mr. Casper's whole argument is that AES couldn't afford not to work in the

ACCC despite the unfavorable conditions, didn't want to obtain Carpenters

---

did not like what SMG was doing" (Casper Br. at 43-43a & n.98a (citing
Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451
(1992)).  Without using the term, Mr. Casper is referring to the concept of
"switching costs" discussed in Kodak, which was not a boycott case.  Kodak
was a tying case, in which the Court held that a seller without market power
in the tying product market (there, complicated and expensive business
machines) could still be liable for "tying" that product to an aftermarket
product related to the tying product (there, parts and service), because, once
the consumer had invested in the tying product, the cost of switching to a
competing tying product in order to avoid the tie to subsequent purchases of
parts and service was too great.  Id. at 476-77.  What Mr. Casper seems to be
saying is that the geographic market in which a seller has chosen to sell,
even if not otherwise a relevant market, becomes a relevant market as to
that, individual seller if that seller's costs to sell in a broader, or distinct,
geographic market would be too high.  Kodak says no such thing.

[17]Among these flaws are Mr. Casper's continued failure to demonstrate that
any of these various markets to which he refers are relevant for antitrust
purposes and his inability to explain how, if the expulsion of one competitor
from the wholesale cooperative in Northwest Wholesale Stationers was, as a
matter of law, not so inherently aniticompetitive as to warrant per se
treatment, even the total exclusion of one Service Contractor from the
ACCC (or, for that matter, from the Atlantic City area generally) would be
inherently anticompetitive.  The source of these flaws is twofold.  First, Mr.
Casper continues to equate harm to competitors with harm to competition.
Second, he relies upon an unspoken presumption that any restriction on
competition is per se unlawful unless it is affirmatively demonstrated to have
predominately pro-competitive effects (Casper Br. at 40 & n.97), thus
effectively reversing the burden of proof which Northwest Wholesale
Stationers places on him.

labor on the same terms as everyone else as a condition of doing so on a level economic playing field and was therefore required to use SMG's Carpenters under the less-attractice 1983 Agreement (Casper Br. at 37 & 43-44).  It is as if Pacific Stationery was demanding access to the wholesale pricing offered by the Northwest cooperative without being required to join and comply with the conditions of membership.

Thus, the <u>per se</u> rule does not apply as a matter of law.

3.      Mr. Casper's Claim Fails as a Matter of Law
        Under the Rule of Reason, Because he has Failed
        to Establish the Relevant Markets and has Failed
        <u>to Establish any Injury to Competition.</u>

(a)     <u>The Relevant Markets</u>

As with his tying claim, Mr. Casper here is still wildly "mixing and matching" supposedly relevant markets without proving that any of them reflects economic reality.  To bring some semblance of order to the analysis, though, we must identify what proposed market we need to be talking about in the context of a group boycott claim.  Clearly, that market is the one in which the alleged boycott supposedly took place; that is, the market in which at least one party to the alleged boycott was attempting to obtain a competitive advantage at the expense of another competitor in that market.

PH1 811806v5 03/27/06

Malley-Duff, 734 F.2d at 140.  This is where Mr. Casper gives up all pretense of consistency.

As discussed above, Mr. Casper started out characterizing the alleged "refusal to deal" as being (a) the attempted exclusion of AES from the market for "selling [or re-selling] Carpenters labor" in the ACCC" and (b) the attempted exclusion of the Painters Union, for which Mr. Casper deems AES a "proxy," from the market for "providing union show labor in the ACCC generally" (Casper Br. at 37).  Ignoring for a moment all of the other problems with these proposed market definitions, what evidence does Mr. Casper offer to establish that the ACCC, standing alone, is any more a relevant geographic market for the provision of Carpenters show labor, or show labor generally, than it is a relevant market for providing venue space for Large Trade Shows?[18]  None.  In fact, the actual evidence is to the contrary.  At the very least, the Service Contractors actively "buy" that product from the Carpenters throughout the seven county South Jersey area (indeed, one of Mr. Casper's principal complaints is that the Carpenters wouldn't recognize the ACCC as market distinct from the entire seven

---

[18] Indeed, given the fact discussed above that no competitor was excluded from those alleged markets as defined but was, at most, prohibited from assigning the specific tasks constituting traditional Carpenters Show Work to others, Mr. Casper would actually have to prove that the impossibly narrow market of "providing show labor to perform those tasks traditionally performed by Carpenters in the ACCC" is a relevant market.

30

county area and give AES the Seven County Agreement terms in an ACCC-only agreement)(Casper Br. at 34).  Beyond that, not only do the Service Contractors "buy" that product from the Painters throughout the State of New Jersey, AES's own contract with the Painters embraces that statewide jurisdiction (Casper Br. at 5 & n.11).

Similarly, as SMG discussed in the context of the "tying" claim, Mr. Casper offers no evidence to establish that "Carpenters" labor is a distinct product from "show labor" generally or that either type of labor "in the ACCC" is a product distinct from such labor elsewhere (SMG Br. at 43-44). To the contrary, the whole point of Mr. Casper's claim is that show labor provided by other unions is not only completely interchangeable with Carpenters labor, it's better, faster and cheaper and AES's inability to use it is what caused the injury about which he's complaining (Casper Br. at 44-45).  We also know from the "tying" discussion that the mere fact that SMG requires its use for some purposes fails as a matter of law to support a distinction between Carpenters show labor and other show labor, anymore than Domino's requirement that its franchisees use approved plates, cups and sauce rendered those distinct products from plates, cups and sauce generally.  Queen City Pizza, 124 F.3d at 438.

31

As discussed above, what Mr. Casper then does is to try and link the alleged refusal to deal in either or both of those markets to the entirely separate market of providing general services to trade shows in Atlantic City.  As baseless and bizarre as is that effort itself, it begs another question. What evidence does Mr. Casper offer that "the Atlantic City area" is a relevant geographic market for the provision of general services to trade shows?  Again, none.  To cite only one example to the contrary, he and Mr. Perrino testified that AES worked all over the country and the world (Casper Dep. Tr. at 12 & 149; Perrino Dep. Tr. at I:86).

What Mr. Casper tells us, though, is that he doesn't have to establish his proposed relevant market through the normal analysis of cross-elasticity of supply and demand, because the "relevant market for a refusal to deal case may be defined by the market from which the Plaintiff has been denied access" (Casper Br. at 38 (citing Wirtz, 807 F.2d at 531-32)).  Aside from the fact that, once again, AES was not "denied access" to anything, Wirtz did nothing to change the settled rule that the relevant geographic market cannot be defined simply as the area in which the seller seeks to sell.  See, e.g., Urdinaran v. Aarons, 115 F. Supp.2d 484, 490 (D.N.J. 2000)(Irenas, J.)(citing Tunis Bros. Co., 952 F.2d at 726).

32

In <u>Wirtz</u>, the Court found the relevant market to be the presentation of professional basketball in the Chicago area.  807 F.2d at 531-32.  Contrary to Mr. Casper's suggestion, it did not do so because that was the market from which the plaintiffs were excluded.  It did so based on the evidence that fan demand for the product is unaffected by the availability of other sports or entertainment and that virtually all fans who attend NBA games come from within 35 miles of the home arena.  <u>Id.</u> at 531.  On appeal, the Wirtzes didn't challenge those facts, but argued that, because only one competitor would be successful in purchasing the team, they did not "meet or plan to meet" in competition in that market.  <u>Id.</u>  The Seventh Circuit rejected that argument, reasoning, in the language relied upon by Mr. Casper, that the antitrust laws are equally applicable to competition <u>for entry into</u> the properly-established, relevant market as they are to competition <u>in the relevant market itself</u>.  Thus, Mr. Casper's reliance on <u>Wirtz</u> is completely misplaced.

    (b)   <u>Injury to Competition</u>

As SMG has already discussed in connection with other claims, Mr. Casper consistently muddles the essential, but distinct, concepts of an injury to competition (which is an element of the substantive antitrust violation) and antitrust injury to AES or another individual competitor (which is an element of its antitrust standing).  <u>Bocobo</u>, 305 F. Supp.2d at 425 & n.3

33

(citing <u>City of Pittsburgh v. West Penn Power Co.</u>, 147 F.3d 256, 266 (3d Cir. 1998)).

Proof of injury to competition requires evidence that prices increased or the number or quality of competitors decreased in whatever market is relevant.  <u>Mathews v. Lancaster Gen. Hosp.</u>, 87 F.3d 624, 641 (3d Cir. 1996)(quoting <u>Tunis Bros. Co., Inc. v. Ford Motor Co.</u>, 952 F.2d 715, 728 (3d Cir. 1991), <u>cert. denied</u>, 505 U.S. 1221 (1992)).  Mr. Casper offers no such evidence as to any of the markets he posits.  If we're talking about the proposed market for providing Carpenters labor in the ACCC, there is no evidence that the cost of that labor when up or that its availability or quality went down.  To the contrary, Mr. Casper himself argues that the effect of the Seven County Agreement was to <u>decrease</u> the overall cost of <u>Carpenters</u> labor in the ACCC (Casper Br. at 41), which, for purposes of his refusal to deal claim, is the first market he posits.[19]  That being the case, and there being no allegation that any SMG/Carpenters Agreement increased the cost

---

[19] What he then does is argue that, notwithstanding the lowering of the price of <u>Carpenters labor in the ACCC</u>, the Seven County Agreement increased <u>total labor cost outside the ACCC</u> by mandating the use of Carpenters there (Casper Br. at 41-42).  Of course, at least in Mr. Casper's world, the latter are totally different product and geographic markets from the ones Mr. Casper himself proposes as the focus of the alleged refusal to deal. Once again, he is simply "mixing and matching" alleged markets in ways that neither the antitrust laws nor economic reality will permit.

of other labor in the ACCC, it follows that the effect of the Seven County

Agreement was to decrease the <u>overall</u> cost of providing show labor in the

ACCC, which is the second refusal to deal market he posits.  Finally, SMG

has already discussed Mr. Casper's failure to demonstrate that either the

Subcontracting or Seven County Agreements caused Service Contractor

prices to Show Producers to increase, or the number of Show Contractors or

the quality of their service to decrease, either in the ACCC or in the Atlantic

City area (SMG Br. at 21-23), the third market to which he refers in the

course of his boycott claim.  Thus, there is no evidence of harm to

competition.[20]

The rest of Mr. Casper's discussion involves simply the various sorts

of harm that he claims were suffered by AES, other Service Contractors and

the Painters Union.  While the nature of the injury claimed by a competitor

in the relevant market may be material to whether that competitor has

antitrust standing, <u>Atlantic Richfield Co. v. USA Petroleum Co.</u>, 495 U.S.

---

[20] Mr. Casper argues hypothetically that labor prices to Service Contractors
and Service Contractor prices to Show Producers didn't go down and the
quality of the service provided by the Carpenters didn't go up as they might
have if other unions had been permitted to compete to provide labor to
perform the traditional Carpenters Show Work (Casper Br. at 43-45).  Of
course, hypothesis is not evidence and Mr. Casper himself concedes that,
even after SMG ceased enforcing these agreements after the NLRB's
decision, leaving AES free to use whatever labor it liked, he did not always
pass his labor cost savings on to his customer (Casper Dep. Tr. at 188).

328, 344 (1990); <u>Bocobo</u>, 305 F. Supp.2d at 425, it is not material to proof of a substantive antitrust violation, because harm to one competitor (or several competitors) is not harm to overall competition cognizable under the antitrust laws.  <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 488 (1977)(quoting <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 320 (1962)).

PH1 811806v5 03/27/06

## IV.  **CONCLUSION**

For all of the foregoing reasons, as well as for those contained in their principal Brief, the Defendants, SMG and Robert McClintock, respectfully request that their Motion for Summary Judgment be granted and that judgment be entered in their favor and against the Plaintiff, Howard Casper.

Respectfully submitted,

/s/ Jessica L. Pollock
James A. Matthews, III (JM2718)
Jessica L. Pollock (JP7037)
Kelly A. McGrady (KM3843)
Fox Rothschild LLP
2000 Market Street, 10th Floor
Philadelphia, PA  19103-3291
215-299-2762/2150 (FAX)

Attorneys for the Defendants,
SMG and Robert McClintock

Of Counsel:
Veronica G. Kayne (VK5963)
Haynes and Boone, LLP
1615 L Street, NW
Washington, DC  20036
(202) 654-4517/4247 (FAX)

DATED:  March 27, 2006

PH1 811806v5 03/27/06

## <u>CERTIFICATE OF SERVICE</u>

I, JESSICA L. POLLOCK, hereby certify that a true and correct copy

of the foregoing Reply Brief in Support of Defendants, SMG and Robert

McClintock's, Motion For Summary Judgment was served upon counsel for

the parties on this date via First Class Mail at the addresses indicated:

Gary Green, Esquire
Casey Green, Esquire
Sidkoff, Pincus & Green, P.C.
2700 Aramark Tower
1101 Market Street
Philadelphia, PA 19107

James Katz, Esquire
Spear, Wilderman, Borish, Endy,
  Spear & Runckel, P.C.
1040 North Kings Highway, Suite 202
Cherry Hill, NJ 08034


/s/ Jessica L. Pollock
                Jessica L. Pollock

DATED:  March 27, 2006

PH1 811806v5 03/27/06