IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HOWARD CASPER,<br><br>Plaintiff,<br><br>v.<br><br>SMG (formerly known as Spectacor Management Group), et al.,<br><br>Defendants. | CIVIL ACTION<br><br><br><br>NO. 00-3465 |

SUPPLEMENTAL BRIEF FOR THE DEFENDANTS,
SMG AND ROBERT MCCLINTOCK, IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT

James A. Matthews, III (JM 2718)
Jessica L. Pollock (JP 7037)
Kelly A. McGrady (KM 3843)
Fox Rothschild LLP
2000 Market Street, 10th Floor
Philadelphia, PA  19103-3291
215-299-2762/2150 (FAX)

Attorneys for the Defendants,
SMG and Robert McClintock

Of Counsel:

Veronica G. Kayne (VK5963)
Haynes and Boone, LLP
1615 L Street, NW
Washington, DC  20036
(202) 654-4517/4247 (FAX)

PH1 884756v3 10/10/06

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

I.   INTRODUCTION ............................................................................................ 1

II.  ARGUMENT .................................................................................................... 1

    A.   The Refusal to Deal Theory Still Fails as a Matter of Law ........... 1

    B.   The Tying Arrangement Theory Still Fails as a Matter of Law..... 7

III. CONCLUSION ............................................................................................... 15

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Action Ambulance Serv., Inc. v. Atlanticare Health Servs., Inc.*,
815 F. Supp. 33 (D. Mass 1993)...................................................9

*Elliott v. The United Center*, 126 F.3d 1003 (7th Cir. 1997) ..................12, 14

*Jefferson Parish Hospital v. Hyde*, 466 U.S. 2 (1984)..............................8, 10

*Larry V. Muko, Inc. v. Southwestern Pa. Building &
Construction Trades Council*, 609 F.2d 1368 (3d Cir.),
cert. denied, 459 U.S. 916 (1982)............................................. 2-4

*Mathews v. Lancaster General Hospital*, 87 F.3d 624
(3d Cir. 1996) .................................................................3

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.2d 430
(3d Cir. 1997), cert. denied, 523 U.S. 1059 (1998)...........................10, 12

*Urdinaran v. Aarons*, 115 F. Supp. 2d 484 (D.N.J. 2000) ..............................5

## SECONDARY SOURCE

Model Jury Instructions in Civil Antitrust Cases
at B-50 & B 5-54 (2005) .........................................................6

I.  INTRODUCTION

As SMG[1] understands it, the question on which the Court has requested supplemental briefing is this:

> Assuming the Court was to find at trial that SMG and the Carpenters agreed that, for their mutual benefit, the Carpenters would insist upon a seven county agreement, rather than an ACCC-only agreement, with the Service Contractors, would that constitute an antitrust violation under either a tying arrangement or group boycott/refusal to deal theory?

The answer is no, because, as to each theory, a traditional antitrust analysis is still required and Mr. Casper still fails as a matter of law to establish one or more of the essential elements of either.[2]

SMG is entitled to summary judgment.

II.  ARGUMENT

A.   The Refusal to Deal Theory Still Fails as a Matter of Law

Following oral argument, SMG understands Mr. Casper's "best shot" to go something like this:

---

[1] Once again, SMG and Mr. McClintock will be referred to jointly as "SMG" and both consent to the Carpenters' reliance on their arguments. SMG will continue to use the "short form" references as defined in its principal brief.

[2] SMG notes once again that neither of these theories appear anywhere in the Complaint, the latter surfaced only in response to the motions for summary judgment and Mr. Casper has yet to explain how that's proper (SMG Br. at 25 n.17; SMG Reply Br. at 9).

> In Muko, the plaintiff was entitled to go to trial on the question of whether Long John Silvers and the Building Trades agreed that the former wouldn't do business with non-union contractors and, if so, whether that was an unreasonable restraint of trade in the market of building fast food restaurants. I'm entitled to go to trial on the question of whether SMG and the Carpenters agreed that Service Contractors couldn't work in the ACCC unless they signed the Seven County Agreement and, if so, whether that was an unreasonable restraint of trade in the market of providing general services to Show Producers presenting Large Trade Shows in the ACCC.

To obviate a more detailed discussion, let's indulge Mr. Casper in the assumption that the quarter-century old decisions in Muko[3] remain entirely good law and would control the analysis here. His "best shot" still misses wide by a large margin.

First, Muko itself is dispositive of any claim of a per se violation because the alleged agreement does not involve horizontal competitors or the exclusion or competitive marginalization of a horizontal competitor of one of the parties to the agreement (SMG Reply Br. at 22-29).[4] The Third

---

[3] Larry V. Muko, Inc. v. Southwestern Pa. Bldg. & Constr. Trades Council, 670 F.2d 421 (3d Cir. 1982)("Muko II"), cert. denied, 459 U.S. 916 (1982); Larry V. Muko, Inc. v. Southwestern Pa. Bldg. & Constr. Trades Council, 609 F.2d 1368 (3d Cir. 1979) (en banc)("Muko I").

[4] As suggested by the Court and for the sake of brevity and simplicity, SMG will, where possible, simply reference its earlier briefing on a particular

Circuit in Muko II held that the plaintiff was not entitled to a per se instruction, even though the alleged agreement completely excluded all non-union contractors from doing business with Silver's, precisely because the agreement did not exclude horizontal competitors of any party to the agreement. 670 F.2d at 430-33. Thus, even if this Court were to find at trial that an actual agreement existed and was implemented on the terms posited, a per se group boycott claim would still fail as a matter of law because neither of the parties to the alleged agreement -- SMG and the Carpenters -- was a horizontal competitor of AES.

That leaves a rule of reason claim in which Mr. Casper has to prove that the challenged restraint actually caused some injury to competition in a relevant market before we even get to the question of whether that injury rendered the restraint unreasonable (SMG Br. at 17-24; SMG Reply Br. at 33-36). As the Third Circuit has explained, "injury to competition" means that quality-adjusted prices increased or the number of competitors decreased in whatever market is relevant. See, e.g., Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 641 (3d Cir. 1996). In Muko, the court pointed in this regard to evidence that the actual prices charged to Silver's by the union

---

issue, which contains the relevant case citations, rather than repeating the citations here.

contractors were substantially higher than the amounts Muko had charged for the same sorts of projects employing its non-union labor. Muko I, 609 F.2d at 1374.

And here? Certainly, Mr. Casper acknowledges that he needs to prove actual harm to competition or he wouldn't have gone on in his brief about how the challenged restraint supposedly caused higher Service Contractor prices to Show Producers and Exhibitors in the Atlantic City market (Casper Br. at 43).[5] What he needs to avoid summary judgment, though, is not simply <u>discussion</u> of what he thinks, believes or speculates might have happened, but rather <u>evidence</u> that Service Contractor prices actually did increase or that the number of contractors decreased. He doesn't have any (SMG Br. at 21-23; SMG Reply Br. at 34-35).[6] Thus, this

---

[5] Of course, this begs the question whether "providing general services to large trade shows," whether "in the ACCC" or "in the Atlantic City area," is a relevant market in the first place. As SMG has already discussed at length, Mr. Casper fails as a matter of law to prove that it is (SMG Br. at 35-36 & 41-42; SMG Reply Br. at 29-31). As with all of these other flaws in his case, proof that SMG and the Carpenters agreed on the terms posited by the Court does nothing to establish the relevant markets.

[6] The fact that the record is devoid of such evidence isn't really the worst of it. What's worse is that neither Mr. Casper nor his "experts" even undertook to study the actual effects of the restriction on Service Contractor prices or competition (SMG Br. at 21-23 & 38 n.23) and that Mr. Perrino testified that the number of Service Contractors working in the ACCC remained relatively constant over the relevant period (Perrino Dep. Tr. at I: 93), as did their prices (Perrino Dep. Tr. at II: 113), that all Service Contractors had to keep

case is not like <u>Muko</u> at all.  Rather, it is virtually on "all fours" with <u>Urdinaran</u>, in which this Court refused to permit Dr. Urdinaran to escape summary judgment on his claim that the denial of staff privileges at the Atlantic City Medical Center was an actionable refusal to deal, observing that "[o]ther than alleging that his business declined as a result of the loss of his staff privileges at ACMC, plaintiff has provided no evidence of rising prices or a decline in the quality of care." <u>Urdinaran v. Aarons</u>, 115 F. Supp. 2d 484, 489 (D.N.J. 2000)(Irenas, J.).

Moreover, Mr. Casper's effort to shoehorn his story into the <u>Muko</u> framework requires a factual assumption beyond that posited by the Court and directly contrary to the undisputed facts.  The challenged agreement in <u>Muko</u> was to <u>completely exclude</u> the entire class of non-union contractors from the posited market and that exclusionary agreement was <u>actually implemented</u>.  To come within <u>Muko</u>, then, Mr. Casper would have to prove not only that SMG and the Carpenters agreed that SMG would "refuse to deal" with Service Contractors (by preventing them from working at the ACCC) unless they signed the Seven-County Agreement, but also that SMG actually did "refuse to deal" by excluding them.  An actual refusal is,

---

their prices "within a certain range" or the Show Producers "wouldn't use them" (Perrino Dep. Tr. at II: 111-12) and that competition always existed among Service Contractors (Perrino Dep. Tr. at II: 145).

logically enough, an essential element of any concerted refusal to deal claim. See ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at B-50 & B 5-54 (2005)(to prevail on a concerted refusal to deal claim, the plaintiff must prove "First, that the defendant and one or more other persons refused to deal with the plaintiff . . . .") (emphasis in the original). But it's undisputed that, whatever theoretical agreement we might posit as having once been reached between SMG and the Carpenters, AES was never required to sign the Seven County Agreement to work in the ACCC and continued at all times to work in the building under the same terms it always had, obtaining Carpenters from SMG under the 1983 Agreement (SMG Reply Br. at 9-10). Thus, this case is still nothing at all like Muko.

So what's left? Presumably, a theory something like this:

> SMG (to improve its competitive position with the casino hotels) and the Carpenters (to improve their competitive position with the Painters and Stagehands) agreed that obtaining the more favorable terms of the new agreement in the ACCC would be conditioned on a Service Contractor signing the Seven County Agreement. Even though AES wasn't excluded from working in the ACCC, it was damaged by having to pay the higher costs of the 1983 Agreement to avoid having to sign the Seven County Agreement.

-6-

Again assuming this interpretation of the Court's hypothetical, there was an agreement between SMG and the Carpenters that disadvantaged AES when it worked in the ACCC. But so what? If the necessary elements of a recognized theory of liability are absent, how is it a cognizable <u>antitrust</u> injury?[7] It just isn't.

Thus, even if Mr. Casper could prove an SMG/Carpenters agreement on the terms posited by the Court, his concerted refusal to deal/group boycott theory still fails as a matter of law.

B.  <u>The Tying Arrangement Theory Still Fails as a Matter of Law</u>

At oral argument, Mr. Casper described two "tying arrangements" (Tr. at 9/12/06 at 49-50 & 60-61), both of which are best characterized in his own counsel's words as trying to "push a triangular peg into a rhombus hole" (Tr. at 9/12/06 at 41).

The first focuses on the ACCC alone and suggests that the "tying" product was either (a) venue space sold to the Show Producer or (b) the ability of Service Contractors to work in the building and that the "tied" product was Carpenters labor for Carpenters Show Work. This theory is

---

[7] As the Court itself observed at oral argument, "[l]ots of people enter contracts which hurt other people. That happens all the time. Now, the question is, not every . . . agreement is an antitrust violation" (Tr. of 9/12/06 at 70). <u>See also</u> SMG Br. at 17-19.

absurd for several reasons. First, there can't be a tying arrangement unless, at a minimum, a single buyer is forced to buy two separate products. Jefferson Parish Hosp. v. Hyde, 466 U.S. 2, 12 (1984) ("essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product"). That didn't, and couldn't, happen here.[8] Second, this theory would require proof that SMG had "market power" in the "tying" market for venue space which, in turn, would require proof of the impossible: That the ACCC alone is a relevant geographic market for trade shows (SMG Br. at 33-41 & 43).[9] Third, there is no evidence that SMG (the seller of the alleged "tying" product) has any economic interest in the use of Carpenters show labor in the ACCC (the alleged "tied" product) (SMG Br. at 45; SMG Reply

---

[8] While Show Producers do "buy" venue space from SMG, they don't "buy" Carpenters labor at all. Rather, they buy a package of services from the Service Contractor of which Carpenters labor is one raw material (or, in antitrust terms, one "input") (SMG Br. at 22-24). Conversely, while the Service Contractors do "buy" Carpenters labor, they don't "buy" anything from SMG, including the ability to work in the ACCC. The Service Contractor's "right" to do that is entirely derivative of the client Show Producer's contract with SMG for the venue space (SMG Br. at 4-6).

[9] The Court has already stated its view of that theory (Tr. of 9/12/06 at 14).

Br. at 16-17).[10] Fourth, for all the reasons discussed below, Mr. Casper fails as a matter of law to establish that "Carpenters show labor" is a product distinct from other show labor.

Mr. Casper's more straightforward (albeit no more availing) formulation is that the alleged "tying product" was Carpenters labor in the ACCC on the same substantive terms as contained in the Seven County Agreement and that the "tied" product was the same labor on the same terms outside the ACCC (Tr. of 9/12/06 at 49-50 & 61).[11] Regardless of whether SMG and the Carpenters had agreed on the terms posited by the Court, the fact remains that AES was neither an actual purchaser of the "tied" product (because it never signed the Seven County Agreement) nor a competing supplier (because, again, Service Contractors don't sell "labor" they sell a

---

[10] Indeed, the entire point of the Court's hypothetical was to propose that SMG's competitive interest was in the tie between labor inside the ACCC and labor in the casino hotels, not any tie entirely within the ACCC itself. Thus, the Court's hypothetical has no bearing on this tying claim. Further, and contrary to counsel's repeated suggestions at oral argument, it is absolutely essential to any tying claim that the seller of the "tying" product have a direct economic interest in the "tied" product, whether because it is also the seller of that product of because, as in <u>Jefferson Parish Hospital</u> and <u>Action Ambulance</u>, it is receiving payments from the actual seller of the tied product (SMG Reply Br. at 16-17).

[11] <u>See also</u> Casper Br. at 31; Perrino Dep. Tr. at II:71 & 85-86; Harvey Dep. Tr. at 190-91; Casper Answers to SMG Interrogatory No. 2 & Carpenters Interrogatory No. 1.

-9-

bundle of products and services of which labor is one "input"). Thus, AES suffered no antitrust injury and Mr. Casper has no standing (SMG Br. at 25-30 & 43-45; SMG Reply Br. at 11-17 & 22-24).

Further, and again regardless of whether SMG and the Carpenters had agreed on the terms posited by the Court, Mr. Casper still fails as a matter of law to prove that two, distinct products were "tied" (SMG Br. at 43-44).[12] Mr. Perrino (Mr. Casper's purported "expert" on this point) concedes that show labor is fungible and that the only thing that makes Carpenters labor different from competing labor is that SMG required its use for Carpenters Show work in the ACCC (Perrino Dep. Tr. at II: 77-78 & 150). The Third Circuit has rejected precisely that sort of product market definition. Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.2d 430, 438 (3d Cir. 1997), cert. denied, 523 U.S. 1059 (1998)). Mr. Casper's purported distinction of Queen City Pizza is flatly wrong.[13]

---

[12] The Supreme Court has said it just that clearly: "a tying arrangement cannot exist unless two separate product markets have been linked." Jefferson Parish Hosp., 466 U.S. at 20-21.

[13] Actually, Mr. Casper is going even further and arguing that Carpenters labor is not only a product distinct from, say, Painters labor, but that Carpenters labor under the economic terms of the Seven County Agreement is a product distinct from Carpenters labor under the 1983 Agreement and that Carpenters labor under those terms in the ACCC is a product distinct from the same labor on the same terms outside the ACCC. Under his theory, then, a pretzel sold three for a dollar in Philadelphia is a distinct product

Mr. Casper correctly observes that the franchisees in <u>Queen City Pizza</u> had agreed contractually to use Domino's-approved products and could not then use that agreed-upon condition to argue, for example, that approved pizza sauce was a product distinct from pizza sauce generally. He then suggests that, because AES never itself agreed with anyone to use Carpenters labor, SMG's mandate that it do so is enough to distinguish <u>Queen City Pizza</u>, and make that labor a product distinct from other, otherwise fungible, labor (Tr. of 9/12/06 at 89-90). He's wrong, for the simple reason that the Service Contractors don't get to agree or disagree. They have no "agreement" with SMG at all. The relevant agreement is between the Show Producer and SMG, apart from which the Service Contractor would have no business in the facility in the first place. As a condition of obtaining that agreement, the Show Producer undertook that it, and its contractors, would comply with ACCC policies, including its labor policies, just like the Domino's franchisees had to agree to use approved products if they wanted a franchise (SMG Br. at 4-6).

---

from the same pretzel from the same bakery, but available in Camden only for 75 cents each. Not to put too fine a twist on it, but that's just nuts (or, to put it more formally, that's a theory completely unsupported by any authority cited by Mr. Casper or of which counsel is otherwise aware).

-11-

Finally, this "labor inside tied to labor outside" discussion reaches its most absurd when we turn to whether Mr. Casper can establish that the "seller" of the "tying" product has market power sufficient to force the tie. First, the entire exercise of defining the product as "Carpenters labor" improperly, and absurdly, puts the market power "rabbit" in the "hat".[14] Second, in an attempt to establish the Carpenters' market power over the "tying" product, he limits the geographic scope of the tying market to the ACCC and then argues that SMG's requirement that Carpenters labor be used for Carpenters Show Work in the ACCC establishes the Carpenters' market power (Casper Br. at 30-31). But (ignoring for a moment both the need for two, distinct products and its inherent circularity), the proposed definition of the product markets is fundamentally inconsistent with the proposed definition of the geographic markets. If the Carpenters are selling

---

[14] If you start off defining the "tying" product as "Carpenters" labor, then by definition the Carpenters are going to have market (indeed, monopoly) power regardless of the definition of the geographic market. It's as if you define the product market as Heinz ketchup. Do that, and Heinz is going to have market power in any geographic market. That's why "a firm [cannot] be said to have monopoly power in its own product, absent proof that the product itself has no economic substitutes." Elliott v. The United Center, 126 F.3d 1003, 1005 (7th Cir. 1997)(citing cases). Clearly, there were economic substitutes for Carpenters labor. In fact, this entire case is about SMG's refusal to let AES use those economic substitutes, like the Painters and the Stagehands. And, again, Queen City says that the fact that SMG wouldn't let him use the substitutes isn't enough to make Carpenters labor a product distinct from them for antitrust purposes. 124 F.2d at 438.

the identical product on the identical terms both inside and outside the ACCC (which is what the proposed product market definition says), how can the building alone then be a relevant geographic market for that product?

Frankly, Mr. Casper never really answers that question, but the first clue to what he's trying to do comes when he begins his tying discussion by saying that "SMG had the market power to enforce the tying arrangement" (Casper Br. at 30). Market power in what product market? Certainly not Carpenters labor (which is the product supposedly being "tied"). While Mr. Casper never directly answers that question either, his position becomes clear in his multiple, subsequent references to SMG's control over "larger shows that had to be held in the [ACCC]" (Casper Br. at 32, lines 1-3).[15] Thus, if we take Mr. Casper at his word that the "market power" analysis begins with SMG's power in the market for Large Trade Shows, then we're right back to the argument that the ACCC alone is a relevant geographic market for such shows, a proposition which is both factually unsupportable

---

[15] See also Casper Br. at 32, lines 5-6 ("SMG manipulated Show Contractors into choosing the Carpenter Union for large shows in Atlantic City that could be held only in the [ACCC]") & 32, line 19 – 33, line 1 ("SMG bequeathed to the Carpenter Union unique control over the market for labor used at the larger shows that could physically be held in Atlantic City in no facility other than the [ACCC]").

and legally irrelevant to the definition of the relevant market for the entirely different product of Carpenters labor.

While this is even less clear, Mr. Casper also appears to argue in this context that the ACCC alone is a relevant market for the sale of general services to trade shows when he says that "no regional Show Contractor like AES could afford to not work for Show Producers who held trade shows in the [ACCC]" (Casper Br. at 30, line 22). But, we're not talking here about the market for services to trade shows anymore than we're talking about the market for venue space for trade shows. We're talking about the market for Carpenters labor. This is yet another example of Mr. Casper's "mixing and matching" of markets in a futile effort to manufacture a cognizable antitrust claim. Further, the mere fact that AES would really, really like to do business in the ACCC does not transform it into a distinct market of its own anymore than the United Center in Chicago became a distinct market for the sale of snack foods because the street-corner peanut vendors really, really wanted to do business there. Elliott, 126 F.3d at 1004-05.

Thus, assuming proof of the Court's hypothetical does nothing to save Mr. Casper's tying arrangement claim.

### III. CONCLUSION

For all of the foregoing reasons, as well as for those contained in their principal Brief, the Defendants, SMG and Robert McClintock, respectfully request that their Motion for Summary Judgment be granted and that judgment be entered in their favor and against the Plaintiff, Howard Casper.

Respectfully submitted,

/s/ Kelly A. McGrady
James A. Matthews, III (JM2718)
Jessica L. Pollock (JP7037)
Kelly A. McGrady (KM3843)
Fox Rothschild LLP
2000 Market Street, 10th Floor
Philadelphia, PA  19103-3291
215-299-2762/2150 (FAX)

Attorneys for the Defendants,
SMG and Robert McClintock

Of Counsel:
Veronica G. Kayne (VK5963)
Haynes and Boone, LLP
1615 L Street, NW
Washington, DC  20036
(202) 654-4517/4247 (FAX)

DATED:  October 10, 2006

PH1 884756v3 10/10/06

# CERTIFICATE OF SERVICE

I, KELLY A. MCGRADY, hereby certify that a true and correct copy of the foregoing Supplemental Brief in Support of Defendants, SMG and Robert McClintock's, Motion For Summary Judgment was served upon counsel for the parties on this date by Electronic Filing and First Class Mail at the addresses indicated:

> Gary Green, Esquire
> Casey Green, Esquire
> Sidkoff, Pincus & Green, P.C.
> 2700 Aramark Tower
> 1101 Market Street
> Philadelphia, PA 19107
>
> James Katz, Esquire
> Spear, Wilderman, Borish, Endy,
>    Spear & Runckel, P.C.
> 1040 North Kings Highway, Suite 202
> Cherry Hill, NJ 08034

>              /s/ Kelly A. McGrady
>              Kelly A. McGrady

DATED: October 10, 2006