UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

HOWARD CASPER,                          :
                                        :
            Plaintiff,                  :
                                        :     HONORABLE JOSEPH E. IRENAS
     v.                                 :
                                        :     CIVIL ACTION NO. 00-3465 (JEI)
SMG,(formerly known as                  :
Spectator Management Group);            :          **OPINION**
ROBERT McCLINTOCK; and SOUTH            :
JERSEY REGIONAL COUNCIL OF              :
CARPENTERS, LOCAL 623,                  :
                                        :
            Defendants.                 :


**APPEARANCES:**

SIDKOFF, PINCUS & GREEN, P.C.
By: Gary Green, Esq.
    Casey Green, Esq.
2700 Aramark Tower
1101 Market Street
Philadelphia, PA 19107
     Attorneys for Plaintiff Howard Casper

FOX ROTHCHILD LLP
By: James A. Mathews, III, Esq.
2000 Market Street
10th Floor
Philadelphia, PA 19103
     Attorneys for Defendants SMG and Robert McClintock

JENNINGS SIGMOND, LLP
By: James Katz, Esq.
1040 North Kings Highway
Suite 300
Cherry Hill, NJ 08034
     Attorneys for Defendant South Jersey Regional Council of
     Carpenters, Local 623


**IRENAS,** Senior District Judge:

     This antitrust case arises out of a labor dispute involving

trade show and convention work at the Atlantic City Convention

Center.  Presently before the Court are the Motions for Summary
Judgment filed by Defendants SMG, Robert McClintock, and South
Jersey Regional Council of Carpenters, Local 623 (collectively
"Defendants").  For the reasons that follow, the Court will grant
Defendants' motions.

## I.

Plaintiff's only remaining claim[1] pursuant to § 1 of the
Sherman Act,[2] centers around an agreement between Defendants
Spectator Management Group ("SMG")[3] and South Jersey Regional
Council of Carpenters, Local 623 ("Carpenters"), which was entered
into on April 15, 1996 ("April 15th Agreement").  SMG, the private
management company for the Atlantic City Convention Center
("ACCC"), agreed that if it chose to subcontract out certain trade
show work, namely the construction of exhibit booths and displays

---

[1]  In addition to the Sherman Act claim, the Complaint alleges state law
claims of tortious interference with contracts, civil conspiracy, and
violations of the New Jersey Antitrust Act.  In 2001, District Court Judge
Orlofsky granted Defendants' Motions to Dismiss all of the state law claims,
determining that those claims were preempted by the National Labor Relations
Act.  At that time, the Court also stayed the case with respect to the Sherman
Act claim because the parties were simultaneously involved in litigation
before the National Labor Relations Board.  The NLRB litigation of the labor
issues implicated by this case, and subsequent appeal of the Board's decision
to the Third Circuit (see discussion *infra*), accounts for the long lapse of
time between the Motions to Dismiss and the present Motions.

[2]  15 U.S.C. § 1 ("Every contract, combination in the form of trust or
otherwise, or conspiracy, in restraint of trade or commerce among the several
States, or with foreign nations, is declared to be illegal.").

[3]  Defendant Robert McClintock was, at all relevant times, SMG's General
Manager at the Atlantic City Convention Center.  The parties refer to SMG and
McClintock together as "SMG," as all parties apparently agree that there is no
practical difference between these defendants with respect to the antitrust
issues.

("trade show work"), the work would only be subcontracted to companies ("Show Contractors") having collective bargaining agreements with the Carpenters.

Atlantic Exposition Services ("AES") is one of many Show Contractors that hire laborers to perform trade show work at the ACCC.  AES refused to sign a collective bargaining agreement with the Carpenters, preferring instead to use the Painters Union.  It challenged the April 15th Agreement on two fronts.  First, in 1998, AES filed a complaint with the National Labor Relations Board asserting that the agreement violated § 8(e) of the National Labor Relations Act ("NLRA").  Later, in 2000, AES filed the instant Complaint; thereafter assigning its interest in this litigation to Howard Casper ("Plaintiff"), a former principal of AES.

AES prevailed before the NLRB[4] and the decision was affirmed by the Third Circuit.  Specifically, the Third Circuit held that the April 15th Agreement violated NLRA § 8(e) and the work covered by the agreement was not protected by the "construction industry proviso" to § 8(e).[5]  *Spectator Management Group v. National Labor Relations Board,* 320 F.3d 385 (3d Cir. 2003).  Accordingly, SMG stopped enforcing the April 15th Agreement and has since allowed AES to use the labor of its choice.  Plaintiff identifies the

---

[4]  *See South Jersey Regional Council of Carpenters, Local 623 et al.,* 335 NLRB 586 (2001).

[5]  *See* 29 U.S.C. § 158(e) ("[N]othing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure or other work.").

"liability period" as October 1, 1998 (when SMG required AES to use Carpenters labor in the ACCC) to February 13, 2003 (when the Third Circuit affirmed the NLRB's decision).

The following facts are relevant to the present motions. The ACCC is among the 30 largest convention centers in the country. Show Producers choose among the convention centers and other venues to house their trade show or exhibition.  Once a Show Producer selects the ACCC, it signs a license agreement with SMG which governs the use of the space.  Then the Show Producer must obtain workers to construct and dismantle the exhibit booths and other displays for the show.  The two sources of labor in this case are SMG itself and Show Contractors.

Before the April 15th Agreement, SMG directly employed the workers who did all the trade show work in the ACCC; no trade show work was subcontracted out to Show Contractors.  Pursuant to a 1983 collective bargaining agreement, SMG only employed workers represented by the Carpenters.[6]  Thus, all Show Producers using the

_____

[6]  The 1983 Agreement was signed by the Atlantic City Convention Center Authority (the "Authority"), which operated the ACCC at that time.  In 1995, the Authority engaged SMG to manage the facility. While the record is not clear as to whether SMG was ever legally bound to the obligations in the 1983 Agreement or when that agreement expired, the parties agree, and the NLRB found, that SMG acted as if it were bound by the 1983 Agreement until the April 15th Agreement was made.  *See South Jersey Regional Council of Carpenters, Local 623 et al.,* 335 NLRB at 587 ("SMG continued to honor the terms of ACCCA's collective bargaining agreement until SMG negotiated a new agreement with the Carpenters in 1996.").  Defendants assert that the issue of what agreement, if any, was in force between SMG and the Carpenters immediately before the April 15th Agreement is only relevant to whether the non-statutory labor exception to the antitrust laws, *see Consolidated Express, Inc. v. N.Y. Shipping Assn.,* 602 F.2d 494 (1979), applies in this case and is not relevant to antitrust injury or Plaintiff's prima facie case with respect to the tying and refusal to deal claims.  Defendants state that because disputed issues of fact exist with regard to the non-statutory labor exception, they have not raised the defense in their motions for summary

ACCC were required to go directly to SMG for the trade show labor they required and all the labor supplied by SMG was Carpenters labor.[7]  SMG made a profit by selling the labor to Show Producers at a marked-up price.  However, SMG's obligations under the 1983 Agreement were quite onerous[8] and, in 1995, SMG began planning and for what ultimately resulted in the April 15th Agreement.  SMG's main objective was to lower its labor costs (thereby lowering the price charged to Show Producers) with the hope of attracting more Show Producers to the ACCC.

The April 15th Agreement allowed SMG to "subcontract" out trade show work to Show Contractors.  Specifically, the April 15th Agreement (drafted by Defendant McClintock) stated:

> Finally, Trade employees who work on a part-time basis or who perform contracted work for SMG (e.g., "show" labor) will work under a Separate Agreement which will be negotiated as soon as practicable.[9]  It is understood and agreed that the Separate Agreement will contain a provision stipulating that in the event that SMG subcontracts the covered work, the work will be subcontracted to a firm which will be [sic] negotiate an agreement with the (Trade) Local having jurisdiction over that work with SMG [i.e. the Carpenters].  The said sub-contractor will be free to negotiate the terms and conditions of the said agreement and will not be bound by SMG's agreement(s) with the applicable local union.

_____

judgment.

[7]  Plaintiff does not contend that this arrangement violated either labor or antitrust laws.

[8]  For example, many trade shows are held over weekends and the 1983 Agreement required double-time pay for Saturday work.

[9]  A "Separate Agreement" was never executed but the parties do not dispute that SMG and the Carpenters conducted business with the intent to be bound by the terms of the April 15th Agreement.

(Pls. App. K at JA387)

Thus, the April 15th Agreement, at least on its face, contemplated that SMG, rather than providing labor directly to Show Producers itself, as it had in the past, would now subcontract that work to Show Contractors.  However, the parties agree that in practice, the April 15th Agreement was interpreted to allow Show Producers to hire Show Contractors directly, without any involvement by SMG.[10]  Thus, SMG was never a "subcontractor" in the traditional sense, despite the parties' description of the April 15th Agreement as a "subcontracting agreement."

The April 15th Agreement also limited the pool of "subcontractors" eligible to work in the ACCC to those who had signed a collective bargaining agreement with the Carpenters, although the Agreement did not specify what the terms of that collective bargaining agreement would be.  The Carpenters' collective bargaining agreement (to which SMG was not a party) required Show Contractors to use Carpenters labor for <u>all</u> work within the Carpenters' seven county jurisdiction in Southern New Jersey (the "Seven County Agreement").  If a Show Contractor refused to sign the Seven-County Agreement, it could not work in the ACCC under the more favorable work rules set by the April 15th

---

[10]   SMG's standard license agreement which Show Producers signed effectively bound the Show Producers to SMG's agreement with the Carpenters. The license agreement required Show Producers "not to violate any labor agreement entered into by ACCCA [or] SMG . . . and comply and/or cause [Show Producers'] employees and independent contractors to be in compliance with all of the provisions of such labor agreements."  (Pls. App. A at JA483)

6

Agreement but it could still work in the ACCC under the terms set
by the 1983 Agreement.

Plaintiff asserts that the Defendants specifically negotiated
and intended the combined results of the April 15th Agreement and
the Seven County Agreement.  Indeed, Plaintiff points to evidence
that SMG, as opposed to the Carpenters, first proposed extending
the Carpernters' CBA to cover all work within the seven counties of
Southern New Jersey.  The work rules and conditions under the 1983
Agreement between the Carpenters and SMG's predecessor were more
burdensome to SMG (and more beneficial to the Carpenters) than the
terms of the April 15th Agreement.  According to Plaintiff, SMG
proposed the Seven County Agreement as a means to compensate for
the less favorable work rules: the Carpenters would give up certain
benefits, such as double-time pay for Saturday work, in exchange
for more work in the smaller venues within the seven county region.
Those smaller venues were mainly hotels and casinos.

Most Show Contractors signed the seven county collective
bargaining agreement with the Carpenters.  AES did not sign the
agreement because it did not want to use Carpenters labor in the
hotels and casinos.  AES preferred less expensive labor, such as
the Painters Union or the Show Hands Union.

The Third Circuit has ruled that Defendants violated
the labor laws.  The only question remaining is whether they have
also violated the antitrust laws.  Defendants move for summary
judgment asserting, among other things, that Plaintiff lacks

7

antitrust standing.  For the following reasons, Defendants' motions
will be granted.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a
judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S.
317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a
motion for summary judgment, the Court must construe the facts and
inferences in a light most favorable to the non-moving party.
*Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir.
1986).  The role of the court is not "to weigh the evidence and
determine the truth of the matter, but to determine whether there
is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 249 (1986). Despite the "factually intensive" nature
of antitrust cases, "the standard of Fed. R. Civ. P. 56 remains the
same."  *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
959 F.2d 468, 481 (3d Cir. 1992) (en banc), *cert. denied*, 506 U.S.
868 (1992); *see also Eastman Kodak Co. v. Image Technical Serv.,
Inc.*, 504 U.S. 451, 468 (1992).

## III.

Plaintiff's theory of the case is that SMG and the

8

Carpenters drafted the April 15th Agreement with the intention that the Carpenters would require all Show Contractors to sign a collective bargaining agreement encompassing the seven counties of Southern New Jersey.  In other words, Plaintiff asserts that Defendants conspired[11] to achieve a scheme whereby the Carpenters gained more hotel and casino work in Southern New Jersey and SMG gained a competitive advantage (through lower labor costs) over the other Southern New Jersey venues which house smaller trade shows.[12]

The conspiracy's objectives were allegedly achieved through a tying arrangement and a concerted refusal to deal in violation of the Sherman Act.  With respect to the tying claim, Plaintiff reasons that Defendants created an illegal tie between large trade show work at the ACCC under the more favorable work conditions set by the April 15th Agreement (the tying product) and labor in the hotel and casino venues within the seven counties of Southern New Jersey (the tied product).  With respect to the refusal to deal claim, Plaintiff reasons that Defendants effectively closed AES out of the ACCC entirely because AES did not use Carpenters labor. Because the Court concludes that Plaintiff has failed to establish that AES suffered an antitrust injury under either theory,

---

[11]  While there are issues of disputed fact as to whether the Carpenters and SMG actually conspired with each other, the record supports the reasonable inference that a conspiracy existed.  Accordingly, for summary judgment purposes only, the Court resolves the factual dispute in Plaintiff's favor and proceeds on the assumption that Defendants conspired with one another.

[12]  The record establishes that the ACCC is not a competitor of the hotels and casinos in the market for large trade shows (generally defined by the parties as shows requiring more than 10,000 square feet of space). However, the ACCC does compete with the hotels and casinos for smaller trade shows.  For smaller trade shows, only a portion of the ACCC is used.

Plaintiff lacks standing and summary judgment for Defendants is warranted.

                                    A.

    "Tying exists where a seller conditions the sale of one good (the tying product) on the buyer also purchasing another, separate good (the tied product)." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 510 (3d Cir. 1998) (citing *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 475 (3d Cir. 1992)).  Not all tying arrangements violate the Sherman Act.  *Id.* at 511 n.6.  The Sherman Act only forbids tying arrangements (and other contracts and conspiracies) that restrain trade.  *Allen-Myland, Inc. v. Int'l Business Machines Corp.,* 33 F.3d 194, 200 (3d Cir. 1994).  Thus, when "the seller can exploit its market power in the tying market to force buyers to purchase the tied product which they otherwise would not, thereby restraining competition in the tied market," an illegal tie has occurred.  *Brokerage Concepts,* 140 F.3d at 510.

    Before reaching the merits of Plaintiff's tying claim, the Court must first determine whether AES suffered an antitrust injury, a necessary prerequisite for Plaintiff's standing to bring suit.  *2660 Woodley Road Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 740-41 (3d Cir. 2004); *Bocobo v. Radiology Consultants of*

                                    10

*S. Jersey*, 305 F. Supp. 2d 422, 425 (D.N.J. 2004).[13]  "Antitrust injury" is an "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *2660 Woodley Road*, 369 F.3d at 738 (quoting *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 568 (1981)).  "It is well-established that an antitrust injury reflects an activity's anti-competitive effect on the competitive market." *Eichorn v. AT&T Corp.,* 248 F.3d 131, 140 (3d Cir. 2001), *cert. denied*, 534 U.S. 1014.

Illegal ties, because of their restraint on competition, principally cause two types of harm.  First, the tie injures buyers of the tied product by foreclosing consumer choice. *Jefferson Parish Hosp. v. Hyde*, 466 U.S. 1551, 1558 n.19 (1984)(quoting *Fortner Enterprises v. U.S. Steel Corp.*, 394 U.S. 495, 512-14 (1969)(dissent by Justice White)).  Under competitive conditions, consumers can avoid the tie and purchase the preferred product (the tying product) elsewhere. *Town Sound*, 959 F.2d at 475 n.4. However, where competition is restrained, consumers are "forced" to buy a product "that the buyer either did not want at all or might have preferred to purchase elsewhere on different terms" because the seller of the tying product has exploited its economic power in the tying market. *Jefferson Parish,* 466 U.S. at 158.

---

[13]  "[A]ntitrust injury is a necessary but insufficient condition of antitrust standing. . . . the district court should first address the issue of whether the plaintiff suffered an antitrust injury.  If antitrust injury is not found, further inquiry is unnecessary." *City of Pittsburgh v. West Penn Power Comp.*, 147 F.3d 256, 265 (3d Cir. 1998).

Second, the tie injures competitors in the tied market. "[A] monopolist in the tying product market may use [its] leverage to garner sales in a second market, thereby foreclosing competitors and monopolizing the formerly competitive tied market too;" or at least, raising substantial "barriers to entry to the tied market." *Town Sound*, 959 F.2d at 476; *see also Fortner*, 394 U.S. at 513. "[Tying arrangements] deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or lower price but because of his power or leverage in another market." *Northern Pacific Railway v. United States,* 356 U.S. 1, 6 (1958).

Thus, in order to determine whether Plaintiff has standing to assert the tying claim, the Court must examine whether AES suffered the type of harm that results from an illegal tying arrangement. Moreover, that issue necessarily requires an inquiry into the relevant markets and the parties' roles within those markets. *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 181 (3d Cir. 1997); *see also Allen-Myland,* 33 F.3d at 200-01 ("The first inquiry in any § 1 tying case is whether the defendant has sufficient market power over the tying product, which requires a finding that two separate markets exist and a determination of precisely what the tying and tied product markets are."); *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 363 (D.N.J. 2001) ("Defining the relevant market may be relevant to . . . whether the plaintiff at bar has suffered the requisite antitrust

injury.  In a tying or monopolization case, determining the
defendant's power in the market may be crucial in deciding whether
the activity complained of actually would alter the competitive
forces sufficiently to constitute a restraint of trade.").

Plaintiff explains that in this case, "[t]he defined relevant
market for the tying product of show labor services at the Atlantic
City Convention Center was fettered unreasonably due to the
monopoly that SMG gave to and enforced for the Carpenters.  The
Carpenter Union was the sole seller in the tying market, and the
Show Contractors were the buyers. . . . Show Contractors had no
choice about which union or labor supply they could use in the
Atlantic City Convention Center."  (Pl. Br. at 32)  Thus, Plaintiff
asserts that AES, as a consumer of trade show labor in the ACCC
(the tying product)[14] was injured by the Defendants' conspiracy
which allegedly reduced competition among labor sources in the
hotels and casinos (the tied market), thereby foreclosing AES's
choice of labor sources in the tied market.

Additionally, Plaintiff asserts that AES suffered antitrust
injury as a competitor of the Carpenters.  Plaintiff explains that
AES competed with the Carpenters for work in the hotels and casinos
and that the tying arrangement reduced competition in the hotel and
casino market, as evidenced by the fact that most of the other Show

---

[14]  Plaintiff identifies the tying product very specifically: "Carpenter
labor at the Atlantic City Convention [sic] at the same price, and with the
same work rules that [AES's] competitors who signed the Carpenter Union's
[Seven County Agreement] had." (Pl. Br. at 31)

13

Contractors signed the Seven County Agreement.  According to Plaintiff, every trade show AES worked was one less chance for the Carpenters to work.

Both of Plaintiff's theories, however, are flawed because they employ an erroneous definition of the relevant market for the tying product.  Nothing in the record supports Plaintiff's assertion that the ACCC is a market of its own.[15]  Indeed, the record directly undermines such a limited definition of the relevant market. Plaintiff testified at his deposition that Show Producers looking for a venue to house their large trade show could go to venues in Philadelphia, Baltimore, New York, Boston, and possibly around the country.  (Casper Dep. at 21-23)  Likewise, Defendant McClintock testified that SMG competes nationally for large trade shows. (McClintock Dep. 153, 208-09)  At a minimum, AES's owner and president, Patrick Perrino, stated in his affidavit that Philadelphia's convention center is comparable to the ACCC. (Perrino Aff. at 3)[16]

---

[15]  Plaintiff's reasoning on this point is circular.  Plaintiff states, "The geographic market here can be defined by both where the Carpenters were the imposed choice, and where SMG separately wielded its power.  Since the Carpenters Union had a monopoly in the ACCC, it is a fitting market." (Pls' Supp. Br. at 14 n.19) The geographic market, however, is not defined by the alleged wrongful actions of the Defendants.  "The geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product."  *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991).

[16]  These facts distinguish this case from *MCM Partners, Inc. V. Andrews-Bartlett & Assoc., Inc.*, 62 F.3d 967 (7th Cir. 1995), upon which Plaintiff relies.  In *MCM Partners*, the Seventh Circuit merely held that a complaint alleging one large trade show venue as the relevant market should not be dismissed on a Rule 12(b)(6) motion.  *Id.* at 975.  The district court dismissed the Sherman Act claim, holding that the alleged relevant market was too narrowly defined.  The Seventh Circuit reversed, but it held, "we need not

14

The undisputed record demonstrates that the ACCC is only one of several large trade show venues.  Moreover, neither SMG or the Carpenters have control over what, if any, restrictions or conditions other comparable venues placed on labor sources used in their venue.  Plaintiff does not allege, and the record does not suggest otherwise.  Thus, even if, as Plaintiff asserts, AES is a "buyer" (i.e. consumer) of labor, there is no evidence in the record that AES could not go to the Philadelphia convention center to buy the labor of its choice and avoid the tie between the ACCC and use of Carpenters labor in the hotels and casinos.

Alternatively, assuming without deciding that AES is properly characterized as a competitor of the Carpenters, it has suffered no injury in the tied product market.  It has not been forced out of the market for trade show work in the hotels and casinos.  Indeed, by using the less expensive Painters Union labor while many other Show Contractors have agreed to use Carpenters labor, AES may have become more competitive relative to its competitors in the alleged tied product market.

Once the relevant market is determined to encompass more than just the ACCC,[17] it is clear that Plaintiff has failed to put forth

definitively decide [the relevant market] at this stage" because "it is not inconceivable that MCM could prove a set of facts supporting the relevant market definition alleged in its complaint."  *Id.* at 976-77.  Here, of course, Defendants have moved for summary judgment and this Court holds that Plaintiff has not proved a set of facts supporting his relevant market definition.

[17]   Issues of material fact may exist as to the precise contours of the relevant market; for example, whether the tying product market is nationwide, or limited to the Northeast, or perhaps even the Mid-Atlantic States. However, such issues do not preclude summary judgment in this case because the undisputed record sufficiently establishes that the ACCC alone cannot be the

any evidence that Defendants, individually or together, possess the type of market power in the tying product market that would enable it to exert the requisite "force" in the tied product market.[18]  By definition, the anti-competitive effect of an illegal tie results from a "seller [exploiting] its market power in the tying market to force buyers to purchase the tied product which they otherwise would not."  *Brokerage Concepts,* 140 F.3d at 510.  Without proof of sufficient market power in the tying product market, there can be no anti-competitive effect and therefore no antitrust injury.

Employing the proper tying market definition, this case may still involve a tie, but merely a tie of the type that is not the concern of antitrust laws.  As the Supreme Court explained in *Jefferson Parish*, "if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition if its competitors were ready and able to sell flour by itself."  466 U.S. at 12.  Here, Defendants tied large trade show work *in one particular venue* to the use of Carpenters labor in the hotels and casinos.  But nothing in the record indicates that AES and other Show Contractors could not go to Philadelphia or Baltimore, for example, for large trade show work and continue to use non-Carpenter labor in the hotels and

relevant market as a matter of law.

[18]  *See Jefferson Parish*, 466 U.S. at 13-14 ("we have condemned tying arrangements when the seller has some special ability-- usually called 'market power'-- to force a purchaser to do something that he would not do in a competitive market.  When 'forcing' occurs, our cases have found the tying arrangement to be unlawful.")(internal citations omitted).

casinos.  In other words, AES could obtain large trade show work (the desirable tying product) without having to use Carpenters in the hotels and casinos (the undesirable or less desirable tied product).  Therefore it suffered no antitrust injury.[19]

## B.

The record also cannot support a finding of antitrust injury under Plaintiff's refusal to deal theory.  Plaintiff's theory is that as a result of the Carpenters' and SMG's concerted refusal to deal with AES, AES was forced out of the relevant market, which AES claims is the ACCC.  Plaintiff reasons that the Defendants' concerted actions disadvantaged AES because if AES wanted to work on ACCC shows, it had to either sign the Seven County Agreement or work under onerous provisions of the 1983 Agreement, which was allegedly not economically feasible.  Essentially, Plaintiff complains that SMG refused to deal with AES on the terms AES preferred, namely working under the more favorable work rules without signing the Seven County Agreement.

The injury complained of, however, is an injury to AES, not to

---

[19]  It is worth noting that during oral argument on the present motions, the parties were granted leave to file supplemental briefing on the issue of antitrust injury.  Plaintiff's supplemental brief principally relies upon five cases: *Blue Shield of Virginia v. McCready,* 457 U.S. 465 (1982); *Connell Construction Co. v. Plumbers and Steamfitters Local Union*, 421 U.S. 616 (1975); *Consolidated Express, Inc. v. New York Shipping Ass'n,* 620 F.2d 494 (3d Cir. 1978); *Larry Muko, Inc. v. Southwestern Pennsylvania Building and Construction Trades Council*, 609 F.2d 1368 (3d Cir. 1979)(*Muko I*); and *Larry Muko, Inc. v. Southwestern Pennsylvania Building and Construction Trades Council*, 670 F.2d 421 (3d Cir. 1982).  All of these cases pre-date *Jefferson Parish Hosp. v. Hyde*, 466 U.S. 1551 (1984), as well as the many Third Circuit cases that have since applied and refined the standing analysis.

competition.  "Injury, though causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anticompetitive aspect of the practice under scrutiny."  *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).  The anti-competitive aspect in refusal to deal cases results from an antitrust defendant's refusal to deal with the plaintiff while simultaneously dealing with the plaintiff's competitors, thereby unreasonably altering the competitive landscape among competitors in the plaintiff's business.  *See, e.g., Nynex Corp. v. Discon, Inc.,* 525 U.S. 128, 130 (1998) ("buyer's decision to buy from one seller rather than another;" "the decision to discriminate in favor of one supplier over another"); *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284 (1985) (purchasing cooperative's alleged arbitrary expulsion of one of its members was a "refusal to deal with [member] on equal footing"); *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959) (retail store agreed with manufacturers and distributors not to sell merchandise to a particular competitor of the retail store's while continuing to sell to other retailers); *Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457 (1941) (clothing designers agreed with manufacturers and suppliers not to sell clothes to retail stores which sold pirated designer clothes while continuing to sell clothes to other retailers).

In this case, however, all Show Contractors are presented with

the same set of conditions for working in the ACCC.  All Show
Contractors were put to the same choice AES faced: either sign the
Seven County Agreement or work under the conditions set by the 1983
Agreement.  Thus, there was no uneven playing field and no harm to
competition.  Therefore, AES suffered no antitrust injury and
Plaintiff lacks standing to assert the refusal to deal claim.[20]

## IV.

For the foregoing reasons, the Court holds that Plaintiff
lacks antitrust standing to assert his Sherman Act claim because
the undisputed record cannot support a finding of antitrust injury.
Accordingly, Defendants' Motions for Summary Judgment will be
granted in their entirety.  The Court will issue an appropriate
order.

October 31, 2006

                              s/ Joseph E. Irenas
                         JOSEPH E. IRENAS, S.U.S.D.J.

---

[20] Because the Court holds that Plaintiff lacks standing to assert the
Sherman Act claim, the Court does not reach the merits of the refusal to deal
theory.  However, Plaintiff's theory would also likely fail on the merits
under either a per se or rule of reason approach because both require proof of
the relevant market.  *See Carpet Group Int'l v. Oriental Rug Importers Ass'n,
Inc.*, 227 F.3d 62, 74 (3d Cir. 2000) ("Per se boycott cases usually contain
three elements: denial of something a competitor needs to compete effectively,
defendants with a dominant position in the relevant market, and the absence of
any plausible contention that the challenged behavior would enhance overall
efficiency and make markets more competitive."); *Eichorn v. AT&T Corp*, 248
F.3d 131, 138 (3d Cir. 2001) ("Under [the rule of reason] test, plaintiffs
have the burden of establishing that, under all the circumstances, the
challenged acts are unreasonably restrictive of competitive conditions in the
relevant market.").  As explained *supra* at Section III. A., Plaintiff has not
put forth sufficient evidence of Defendants' dominance in the relevant
geographic market, which is properly defined as larger than the ACCC.

19